ESTATE OF Michael K. MARTIN by Kathryn Ann MARTIN, Administratrix, Kathryn Ann Martin, an Individual, Kathryn Ann Martin, b/n/f Kyle Michael Martin and Clinton McCallum Martin, Appellants–Plaintiffs,

v.

CONSOLIDATED RAIL CORPO-RATION and R.D. Watkins, Appellees–Defendants.

No. 27A02–9202–CV–74.

Court of Appeals of Indiana, Second District.

Sept. 13, 1993.

David W. Stone IV, Anderson, for appellants-plaintiffs.

Ronald J. Waicukauski, Michael A. Moffatt, White & Raub, Indianapolis, for appellees-defendants.

SHIELDS, Judge.

The Estate of Michael Martin, Michael's widow, Kathryn, and their children, Kyle and Clinton Martin (collectively referred to as Martin) appeal the trial court's grant of summary judgment in favor of Consolidated Rail Corporation (Conrail) and R.D. Watkins. We affirm in part and reverse in part.

### ISSUES

1. Is Martin's negligence claim against Conrail and Watkins preempted by federal law?

2. Has the legislature abrogated the common law duty imposed upon railroad companies pertaining to railroad crossings?

### FACTS

This is a wrongful death action arising out of an April, 1987, accident in which an automobile driven by Michael Martin was struck by a Conrail train. Watkins was a crew member on the train.

Both approaches to the railroad crossing at which the accident occurred were marked by a crossbuck sign and a stop bar on the pavement, and, farther back from the crossing, a white "X" painted on the street and an advance warning sign (a yellow disk marked "RxR"). In 1985, the

Indiana Department of Transportation (DOT) inspected the crossing and recommended the installation of active warning signals. Conrail was notified of the recommendation in May, 1985, and was asked to furnish the DOT with cost estimates for the project. Conrail provided the written estimates in October, 1985. However, because of delays at the state and local level in finalizing the project, it had not yet been funded in April, 1987, when the accident occurred.

Martin filed a complaint in April, 1989, alleging that Michael's death was caused by the unspecified negligence of Conrail and Watkins. In April, 1991, Conrail and Watkins filed a motion for summary judgment. Watkins denied any negligence on his part; Conrail asserted that the Federal Railroad Safety Act of 1970 (FRSA), 84 Stat. 971, as amended, 45 U.S.C. §§ 421–447 (1988 ed. and Supp. II) & the Highway Safety Act of 1973 (HSA), Title II of the Act of Aug. 13, 1973, 87 Stat. 282, as amended, note following 23 U.S.C. § 130, preempted any negligence action under state law and, further, that state legislative enactments have abolished Conrail's previously existing common law duty pertaining to grade crossings.

The trial court granted the motion for summary judgment; Martin appeals.

### DISCUSSION

#### I.

■ The extent to which Martin's negligence claim against Conrail has been preempted by federal law was decided recently by the United States Supreme Court in *CSX Transportation v. Easterwood* (1993), —— U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387.

The plaintiff in *Easterwood* brought a wrongful death action in a Georgia state court alleging that CSX Transportation was negligent for operating a train at an excessive speed and for failing to maintain adequate warning devices at the railroad crossing at which her husband was killed.[1] CSX argued the claim was preempted by the FRSA and the HSA, and the regulations promulgated pursuant to those statutes.[2]

In deciding the issue of preemption, the Supreme Court first noted that "[a]ccording to [45 U.S.C.] § 434[3] applicable federal regulations may preempt any state 'law, rule, regulation, order, or standard relating to railroad safety'.... Thus, the issue be-

---

**1.** The facts as stated in *Easterwood* are as follow:

> [I]n 1979–1980, the [Georgia DOT] decided to install a crossing gate at the West Avenue crossing in Cartersville. That gate could not be installed, however, without placing motion-detection devices at four adjacent crossings, including Cook Street [the crossing at which the accident occurred].... The DOT therefore installed new circuitry at each crossing, and subsequently installed gates at West Avenue and each of the adjacent crossings except Cook Street. Although a gate was also planned for Cook Street and funds set aside for the project, no other devices were installed because the street's width required the construction of a traffic island, which in turn required city approval. When the city declined to approve the island out of concern for the flow of vehicular traffic, the plan for the gate was shelved and the funds allocated for use in another project.

> *Easterwood,* —— U.S. at ——, 113 S.Ct. at 1741.

**2.** These regulations include 23 CFR §§ 646, 655, 924, 1204 (1992). In addition, 23 CFR §§ 655.-

601–603 (1992) incorporate the U.S. Department of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways (1988). These are the same regulations relied upon by Conrail in the instant case.

**3.** 45 U.S.C. § 434 provides:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. *A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.* A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

> (emphasis added).

fore the Court is whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings." *Id.* —— U.S. at —— – ——, 113 S.Ct. at 1737–38 (footnote added).

The Supreme Court, after examining a series of regulations adopted by the Secretary of Transportation which address grade crossing safety and speed, including the regulation which requires that the several states comply with the Manual on Uniform Traffic Control Devices for Streets and Highways (Federal Manual), concluded that 23 CRF § 646.214(b)(3) & (4)[4] are regulations which, for purposes of preemption, sufficiently "cover" the subject of traffic control devices at railroad crossings as to preempt state negligence actions.[5] These regulations

> displace state and private decision-making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.... In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed.... The Secretary's regulations therefore cover the subject of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*Easterwood,* —— U.S. at ——, 113 S.Ct. at 1741. Here, the undisputed evidence is that the plans to install active signals at the crossing in question had not been approved at the time of Michael Martin's accident "because of delays at the local and state level in finalizing the project." Supp.Record, Exhibit A at 3. Consequently, there was not yet any project within the contemplation of 23 CFR §§ 646.214(b)(3) & (4); therefore, Martin's grade crossing claim is not preempted by federal law. The judgment for Conrail on the issue of federal preemption of its alleged negligence based upon the lack of adequate grade crossing warning devices is erroneous.[6]

■ Martin also claims the trial court erred in entering judgment against it on the issue of preemption of Martin's claim that Conrail negligently operated its trains at an excessive rate of speed. Martin concedes there is a federal regulation, 49 CFR § 213.9(a) (1992), that prescribes the maximum speed at which trains may be operated on various classes of tracks, and that at the time of the accident the train was travelling under that maximum speed. However, Martin maintains that because a minimum speed is not prescribed, Conrail still had a common-law duty to operate its train at a reasonable speed under the conditions. This argument was rejected in *Easterwood,* with the Supreme Court holding that 49 CFR § 213.9(a) precludes additional state regulation of train speeds and, therefore, preempts state tort law claims based on excessive speed when the federal speed limit has not been violated.

---

4. In relevant part, these regulations read as follow:

> (b) Grade crossing improvements.
>
> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
>
> (3)(i) Adequate warning devices ... on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist....
> (4) For crossing where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

5. The Supreme Court did not address the preemptive nature of 23 CFR § 646.214(b)(2) (1992), which involves grade crossings "located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of [an] existing roadway," because CSX did not suggest it was implicated. *Easterwood,* —— U.S. at —— n. 10, 113 S.Ct. at 1741 n. 10. We similarly do not address that issue because Conrail has not suggested that the subject crossing is located in or near the terminus of a Federal-aid highway project.

6. The determination of this issue subsumes any claim Martin asserts that Conrail negligently failed to request improvements of the subject grade crossing.

■ Similarly unavailing is the argument that common-law speed restrictions are preserved by the second savings clause of 49 CFR § 434, which provides that "a State may ... continue in force an additional or more stringent law ... relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard...." In *Easterwood* the Supreme Court rejected this argument, stating that "[t]he common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. [Easterwood's] contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434. At the least, this renders [Easterwood's] reliance on the common law 'incompatible with' FRSA and the Secretary's regulations. We thus conclude that [Easterwood's] excessive speed claim cannot stand in light of the Secretary's adoption of the regulations in § 213.-9" *Id.* —— U.S. at ——, 113 S.Ct. at 1743.[7]

Therefore, Conrail established that an applicable federal regulation has preempted Martin's excessive speed claim and judgment for Conrail on this specification of negligence was proper.

Finally, the trial court properly granted judgment in favor of R.D. Watkins. An examination of the record reveals that Martin has wholly failed to set forth any facts which controvert the assertion that R.D. Watkins did not negligently cause Martin's death, regardless of the theories that might be asserted.

## II.

■ Next, we must determine whether the traditional common law duty imposed upon railroad companies pertaining to grade crossings has been abrogated by state legislative action which has imposed this duty exclusively upon public authorities. The statutes upon which Conrail relies in making this argument are IC 8–6–7–1 (1992 Supp.) and IC 8–6–7.7–2 (1992 Supp.).

IC 8–6–7–1 provides:

The Indiana department of transportation shall, upon proper petition by:

(1) five (5) or more citizens of this state, or

(2) a board of county commissioners; conduct a hearing to declare as dangerous or extra hazardous any grade crossing in this state that the department finds to be of such a character as that the safety of the users of the highway requires the installation of automatic train-activated warning signals or other crossing safety devices.

IC 8–6–7.7–2 provides, in relevant part:

The Indiana department of transportation ... may order the installation ... of automatic train-activated warning signals at any grade crossing in the state.... The authority of the department to require the installation of the signals is exclusive and supersedes the power of any other state or local governmental agency.

In *Stevens v. Norfolk & Western Railway Co.* (1976), 171 Ind.App. 334, 339–40, 357 N.E.2d 1, 4, this court, after considering the railroad's argument based on virtually identical predecessors to these statutes, IC 8–6–7–1 (1971) and IC 8–6–7.7–2 (Burns Supp.1976),[8] held that

a railroad can be found negligent, ... once it is determined under all the circumstances that a grade crossing is extra hazardous, ... [for failing] to adequately protect the public from danger by providing warnings and taking safety precautions in addition to those required by statute, and despite the absence of a

---

**7.** We do not address the question whether a local ordinance could be enacted to "eliminate or reduce an essentially local safety hazard." *See* 49 CFR § 434.

**8.** The two statutes are identical to their modern successors in all relevant parts, with one difference being that the government agency involved is now the Department of Transportation, whereas in 1971 and 1976 it was the Public Service Commission.

Public Service Commission determination that the crossing is extra hazardous. *See also Central Indiana Railway Co. v. Anderson Banking Co.* (1969), 252 Ind. 270, 247 N.E.2d 208. Conrail argues, however, that "[n]one of these cases consider fully the transformation in federal and state regulation of rail safety that has occurred over the last two decades," Appellee's Brief at 34, and points to language in the Indiana Manual on Uniform Traffic Control Devices (1981) (Indiana Manual) to support its argument that Indiana has repudiated the duty recognized in *Stevens.*

The Indiana Manual, adopted pursuant to IC 9–4–1–30 (1988) (current version at IC 9–21–4–1 (1992 Supp.)), is modeled after the Federal Manual. Conrail relies upon language in Part VIII D of these manuals which reads:

> The selection of traffic control devices at a grade crossing is determined by public agencies having jurisdictional responsibility at specific locations.... Before a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State.

Federal Manual at 8D–1; Indiana Manual at 8D–1.

In *Easterwood,* CSX made a similar argument. Recognizing that the several states are required to comply with the Federal Manual, CSX contended that because the Federal Manual provides that (1) "[t]he determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority," *id.* — U.S. at ——, 113 S.Ct. at 1740 (quoting Federal Manual at 8A–1), and that (2) "[b]efore a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State," *id.* — U.S.

at —— n. 9, 113 S.Ct. at 1740 n. 9 (quoting Federal Manual at 8D–1), the Federal Manual "covers" the subject matter of state tort law applicable to grade crossings and amounts to a determination by the Secretary of Transportation that state governmental bodies have exclusive responsibility for the safety of railroad grade crossings. In rejecting this argument, the Supreme Court stated:

> Petitioner's argument suffers from an initial implausibility: it asserts that established state negligence law has been implicitly displaced by means of an elliptical reference in a Government manual otherwise devoted to describing for the benefit of state employees the proper size, color, and shape of traffic signs and signals. Not surprisingly, the [Federal] Manual itself disavows any such pretensions: "it is the intent that the provisions of this [Federal] Manual be standards for traffic control devices installation, but not a legal requirement for installation." [Federal] Manual at 1A–4.... As is made clear in the Federal Highway Administration's guide to the Manual, the [Federal Manual] provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between the Federal and State Governments and between States and railroads.... Rather than establishing an alternative scheme of duties incompatible with existing Georgia negligence law, the [Federal] Manual disavows any claim to cover the subject matter of that body of law.

*Easterwood,* — U.S. at ——, 113 S.Ct. at 1740.[9]

We are unconvinced that the intent of the Indiana Manual is distinguishable from that of the Federal Manual. Statements in the Indiana Manual such as:

> and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein.

Federal Manual at 8A–1. The Indiana Manual, Part VIII A contains identical language. *See* Indiana Manual at 8A–1.

---

**9.** In addition to the provision quoted, the *Easterwood* Court relied upon the language in Federal Manual, Part VIII A:

> [T]he highway agency and the railroad company are entitled to jointly occupy the right-of-way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need

[this] has been published as a guide....

The principal purpose of this Manual is to give the size, shape, color, etc. of the signs, markings, and devices which may be used under varying circumstances.

One of the primary purposes of this Manual is to promote uniformity in the type of devices used throughout the State.... This Manual shall not be construed as an instrument to mandate the use of any of the control devices or procedures at a particular location ...,

Indiana Manual at 1A–1, do not evidence an intent to displace established negligence law.

The language in Part VIII D of the Indiana Manual which provides that, "[b]efore a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State," Indiana Manual at 8D–1, does not convince us otherwise. Initially, we note that the use of the phrase "within a given State" strongly suggests that the provision was copied from the Federal Manual, as was almost the entire Indiana Manual, without any particular deliberation. In any event, we conclude this provision, found in both the Federal and Indiana Manuals, merely recognizes that different governmental bodies may have jurisdictional responsibility for a particular grade crossing depending upon whether the intersecting roadway is a private, municipal, county, state, or federal highway, and that it does not propose to exclude any other entity, including a railroad company, from selecting a particular traffic control device at a particular grade crossing, albeit with approval. Indeed, if the sole responsibility for the selection of grade crossing traffic control systems resided with the appropriate agency within Indiana state government, the provision in question would be superfluous.

We conclude that railroad companies have a duty to act reasonably with regard to traffic control devices at their grade crossings. Therefore, the summary judgment in favor of Conrail on the ground that it had no duty pertaining to the grade crossing in question is erroneous.

Summary judgment in favor of R.D. Watkins is affirmed; summary judgment in favor of Conrail is reversed and the cause remanded for further proceedings consistent with this opinion.

STATON and SULLIVAN, JJ., concur.