# NORFOLK SOUTHERN RAILWAY CO. *v.* SHANKLIN, INDIVIDUALLY AND AS NEXT FRIEND OF SHANKLIN

No. 99–312.   Argued March 1, 2000—Decided April 17, 2000

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, *post*, p. 359. GINSBURG, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 360.

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *G. Paul Moates, Stephen B. Kinnaird, Everett B. Gibson,* and *Wiley G. Mitchell, Jr.*

*Gregory S. Coleman,* Solicitor General of Texas, argued the cause for the State of Texas et al. as *amici curiae* urging reversal. With him on the brief were *John Cornyn,* Attorney General of Texas, *Andy Taylor,* First Assistant Attorney General, and *Linda E. Eads,* Deputy Attorney General, *Bill Pryor,* Attorney General of Alabama, *D. Michael Fisher,* Attorney General of Pennsylvania, *Charlie Condon,* Attorney General of South Carolina, and *Norman N. Hill.*

*Thomas C. Goldstein* argued the cause for respondent. With him on the briefs were *Pamela R. O'Dwyer* and *Brian Wolfman.*

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Douglas N. Letter, Michael E. Robinson, Nancy E. McFadden, Paul M. Geier, Dale C. Andrews, Edward V. A. Kussy,* and *S. Mark Lindsey.**

---

*Briefs of *amici curiae* urging reversal were filed for the Association of American Railroads by *Daniel Saphire;* and for the Product Liability Advisory Council, Inc., by *Kenneth S. Geller* and *Charles Rothfeld.*

Briefs of *amici curiae* urging affirmance were filed for the State of North Carolina et al. by *Michael F. Easley,* Attorney General of North Carolina, and *Amy R. Gillespie,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Lockyer* of California, *Ken Salazar* of Colorado, *James E. Ryan* of Illinois, *Carla J. Stovall* of Kansas, *Mike Hatch* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Frankie Sue Del Papa* of Nevada, *Patricia A. Madrid* of New Mexico, *W. A. Drew Edmondson* of Oklahoma, *Sheldon Whitehouse* of Rhode Island, and *Darrell V. McGraw, Jr.,* of West Virginia; for the Angels on Track Foundation et al. by *Robert L. Pottroff;* for the Association of Trial Lawyers of America by *Dale Haralson;* and for the United Transportation Union by *Lawrence M. Mann* and *Clinton Miller III.*

*William C. Hopkins II* and *David V. Scott* filed a brief for Kenneth W. Heathington et al. as *amici curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case involves an action for damages against a railroad due to its alleged failure to maintain adequate warning devices at a grade crossing in western Tennessee. After her husband was killed in a crossing accident, respondent brought suit against petitioner, the operator of the train involved in the collision. Respondent claimed that the warning signs posted at the crossing, which had been installed using federal funds, were insufficient to warn motorists of the danger posed by passing trains. The specific issue we must decide is whether the Federal Railroad Safety Act of 1970, 84 Stat. 971, as amended, 49 U. S. C. § 20101 *et seq.*, in conjunction with the Federal Highway Administration's regulation addressing the adequacy of warning devices installed with federal funds, pre-empts state tort actions such as respondent's. We hold that it does.

I

A

In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U. S. C. § 20101. The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety," § 20103(a), and directs the Secretary to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem," § 20134(a). The FRSA also contains an express pre-emption provision, which states:

> "Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or

issues an order covering the subject matter of the State requirement." § 20106.

Although the pre-emption provision contains an exception, see *ibid.*, it is inapplicable here.

Three years after passing the FRSA, Congress enacted the Highway Safety Act of 1973, § 203, 87 Stat. 283, which, among other things, created the Federal Railway-Highway Crossings Program (Crossings Program), see 23 U. S. C. § 130. That program makes funds available to States for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." § 130(a). To participate in the Crossings Program, all States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." § 130(d). That schedule must, "[a]t a minimum, . . . provide signs for all railway-highway crossings." *Ibid.*

The Secretary, through the Federal Highway Administration (FHWA), has promulgated several regulations implementing the Crossings Program. One of those regulations, 23 CFR § 646.214(b) (1999), addresses the design of grade crossing improvements. More specifically, §§ 646.214(b)(3) and (4) address the adequacy of warning devices installed under the program.* According to § 646.214(b)(3), "[a]de-

---

*Sections 646.214(b)(3) and (4) provide in full:

"(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

"(A) Multiple main line railroad tracks.

"(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

"(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

quate warning devices . . . on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals" if any of several conditions are present. Those conditions include (A) "[m]ultiple main line railroad tracks," (B) multiple tracks in the vicinity such that one train might "obscure the movement of another train approaching the crossing," (C) high speed trains combined with limited sight distances, (D) a "combination of high speeds and moderately high volumes of highway and railroad traffic," (E) the use of the crossing by "substantial numbers of schoolbuses or trucks carrying hazardous materials," or (F) when a "diagnostic team recommends them." § 646.214(b)(3)(i). Subsection (b)(4) states that "[f]or crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." Thus, at crossings where any of the conditions listed in (b)(3) exist, adequate warning devices, if installed using federal funds, are automatic gates and flashing lights. And where the (b)(3) conditions are not present, the decision of what devices to install is subject to FHWA approval.

---

"(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

"(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

"(F) A diagnostic team recommends them.

"(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

"(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA."

## B

Shortly after 5 a.m. on October 3, 1993, Eddie Shanklin drove his truck eastward on Oakwood Church Road in Gibson County, Tennessee. App. to Pet. for Cert. 28a. As Shanklin crossed the railroad tracks that intersect the road, he was struck and killed by a train operated by petitioner. *Ibid.* At the time of the accident, the Oakwood Church Road crossing was equipped with advance warning signs and reflectorized crossbucks, *id.*, at 34a, the familiar black-and-white, X-shaped signs that read "RAILROAD CROSSING," see U. S. Dept. of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices § 8B–2 (1988) (MUTCD). The Tennessee Department of Transportation (TDOT) had installed the signs in 1987 with federal funds received under the Crossings Program. App. to Pet. for Cert. 3a. The TDOT had requested the funds as part of a project to install such signs at 196 grade crossings in 11 Tennessee counties. See App. 128–131. That request contained information about each crossing covered by the project, including the presence or absence of several of the factors listed in § 646.214(b)(3). See *id.*, at 134. The FHWA approved the project, App. to Pet. for Cert. 34a, and federal funds accounted for 99% of the cost of installing the signs at the crossings, see App. 133. It is undisputed that the signs at the Oakwood Church Road crossing were installed and fully compliant with the federal standards for such devices at the time of the accident.

Following the accident, Mr. Shanklin's widow, respondent Dedra Shanklin, brought this diversity wrongful death action against petitioner in the United States District Court for the Western District of Tennessee. *Id.*, at 29–34. Respondent's claims were based on Tennessee statutory and common law. *Id.*, at 31–33. She alleged that petitioner had been negligent in several respects, including by failing to maintain adequate warning devices at the crossing. *Ibid.* Petitioner moved for summary judgment on the ground that the FRSA

pre-empted respondent's suit. App. to Pet. for Cert. 28a. The District Court held that respondent's allegation that the signs installed at the crossing were inadequate was not pre-empted. *Id.*, at 29a–37a. Respondent thus presented her inadequate warning device claim and three other allegations of negligence to a jury, which found that petitioner and Mr. Shanklin had both been negligent. App. 47. The jury assigned 70% responsibility to petitioner and 30% to Mr. Shanklin, and it assessed damages of $615,379. *Ibid.* The District Court accordingly entered judgment of $430,765.30 for respondent. *Id.*, at 48.

The Court of Appeals for the Sixth Circuit affirmed, holding that the FRSA did not pre-empt respondent's claim that the devices at the crossing were inadequate. 173 F. 3d 386 (1999). It reasoned that federal funding alone is insufficient to trigger pre-emption of state tort actions under the FRSA and §§ 646.214(b)(3) and (4). *Id.*, at 394. Instead, the railroad must establish that § 646.214(b)(3) or (4) was "applied" to the crossing at issue, meaning that the FHWA affirmatively approved the particular devices installed at the crossing as adequate for safety. *Id.*, at 397. The court concluded that, because the TDOT had installed the signs for the purpose of providing "minimum protection" at the Oakwood Church Road crossing, there had been no such individualized determination of adequacy.

We granted certiorari, 528 U. S. 949 (1999), to resolve a conflict among the Courts of Appeals as to whether the FRSA, by virtue of 23 CFR §§ 646.214(b)(3) and (4) (1999), pre-empts state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds have participated in the installation of the devices. Compare *Ingram* v. *CSX Transp., Inc.*, 146 F. 3d 858 (CA11 1998) (holding that federal funding of crossing improvement triggers pre-emption under FRSA); *Armijo* v. *Atchison, Topeka & Santa Fe R. Co.*, 87 F. 3d 1188 (CA10 1996) (same); *Elrod* v. *Burlington Northern R. Co.*, 68 F. 3d 241 (CA8 1995)

(same); *Hester* v. *CSX Transp., Inc.*, 61 F. 3d 382 (CA5 1995) (same), cert. denied, 516 U. S. 1093 (1996), with 173 F. 3d 386 (CA6 1999) (case below); *Shots* v. *CSX Transp., Inc.*, 38 F. 3d 304 (CA7 1994) (no pre-emption until representative of Federal Government has determined that devices installed are adequate for safety).

## II

We previously addressed the pre-emptive effect of the FHWA's regulations implementing the Crossings Program in *CSX Transp., Inc.* v. *Easterwood*, 507 U. S. 658 (1993). In that case, we explained that the language of the FRSA's pre-emption provision dictates that, to pre-empt state law, the federal regulation must "cover" the same subject matter, and not merely " 'touch upon' or 'relate to' that subject matter." *Id.*, at 664; see also 49 U. S. C. § 20106. Thus, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood, supra,* at 664. Applying this standard, we concluded that the regulations contained in 23 CFR pt. 924 (1999), which "establish the general terms of the bargain between the Federal and State Governments" for the Crossings Program, are not pre-emptive. 507 U. S., at 667. We also held that § 646.214(b)(1), which requires that all traffic control devices installed under the program comply with the MUTCD, does not pre-empt state tort actions. *Id.*, at 668–670. The MUTCD "provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between Federal and State Governments and between States and railroads," and hence "disavows any claim to cover the subject matter of that body of law." *Id.*, at 669–670.

With respect to §§ 646.214(b)(3) and (4), however, we reached a different conclusion. Because those regulations "establish requirements as to the installation of particular warning devices," we held that "when they are applicable, state tort law is pre-empted." *Id.*, at 670. Unlike the other

regulations, "§§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Ibid.* As a result, those regulations "effectively set the terms under which railroads are to participate in the improvement of crossings." *Ibid.*

In *Easterwood* itself, we ultimately concluded that the plaintiff's state tort claim was not pre-empted. *Ibid.* As here, the plaintiff brought a wrongful death action alleging that the railroad had not maintained adequate warning devices at a particular grade crossing. *Id.,* at 661. We held that §§ 646.214(b)(3) and (4) were not applicable because the warning devices for which federal funds had been obtained were never actually installed at the crossing where the accident occurred. *Id.,* at 671–673. Nonetheless, we made clear that, when they do apply, §§ 646.214(b)(3) and (4) "cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." *Id.,* at 671. The sole question in this case, then, is whether §§ 646.214(b)(3) and (4) "are applicable" to all warning devices actually installed with federal funds.

We believe that *Easterwood* answers this question as well. As an original matter, one could plausibly read §§ 646.214(b)(3) and (4) as being purely definitional, establishing a standard for the adequacy of federally funded warning devices but not requiring that all such devices meet that standard. *Easterwood* rejected this approach, however, and held that the requirements spelled out in (b)(3) and (4) are *mandatory* for all warning devices installed with federal funds. "[F]or projects that involve grade crossings . . . in which 'Federal-aid funds participate in the installation of the [warning] devices,' regulations specify warning devices that *must be installed.*" *Id.,* at 666 (emphasis added). Once it is accepted that the regulations are not merely definitional, their scope is plain: They apply to "any project where

Federal-aid funds participate in the installation of the devices." 23 CFR § 646.214(b)(3)(i) (1999).

Sections 646.214(b)(3) and (4) therefore establish a standard of adequacy that "determine[s] the devices to be installed" when federal funds participate in the crossing improvement project. *Easterwood*, 507 U. S., at 671. If a crossing presents those conditions listed in (b)(3), the State must install automatic gates and flashing lights; if the (b)(3) factors are absent, (b)(4) dictates that the decision as to what devices to install is subject to FHWA approval. See *id.*, at 670–671. In either case, § 646.214(b)(3) or (4) "is applicable" and determines the type of warning device that is "adequate" under federal law. As a result, once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation "displace[s] state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Id.*, at 670.

Importantly, this is precisely the interpretation of §§ 646.214(b)(3) and (4) that the FHWA endorsed in *Easterwood*. Appearing as *amicus curiae*, the Government explained that § 646.214(b) "establishes substantive standards for what constitutes adequate safety devices on grade crossing improvement projects financed with federal funds." Brief for United States as *Amicus Curiae* in *CSX Transp., Inc.* v. *Easterwood*, O. T. 1992, Nos. 91–790 and 91–1206, p. 23. As a result, §§ 646.214(b)(3) and (4) "cover the subject matter of adequate safety devices at crossings that have been improved with the use of federal funds." *Ibid.* More specifically, the Government stated that § 646.214(b)

> "requires gate arms in certain circumstances, and requires FHWA approval of the safety devices in all other circumstances. Thus, the warning devices in place at a crossing improved with the use of federal funds have, by definition, been specifically found to be adequate under a regulation issued by the Secretary. Any state rule that

more or different crossing devices were necessary at a federally funded crossing is therefore preempted." *Id.,* at 24.

Thus, *Easterwood* adopted the FHWA's own understanding of the application of §§ 646.214(b)(3) and (4), a regulation that the agency had been administering for 17 years.

Respondent and the Government now argue that §§ 646.214(b)(3) and (4) are more limited in scope and only apply where the warning devices have been selected based on diagnostic studies and particularized analyses of the conditions at the crossing. See Brief for Respondent 16, 24; Brief for United States as *Amicus Curiae* 22 (hereinafter Brief for United States). They contend that the Crossings Program actually comprises two distinct programs—the "minimum protection" program and the "priority" or "hazard" program. See Brief for Respondent 1–7; Brief for United States 15–21. Under the "minimum protection" program, they argue, States obtain federal funds merely to equip crossings with advance warning signs and reflectorized crossbucks, the bare minimum required by the MUTCD, without any judgment as to whether the signs are adequate. See Brief for Respondent 5–7, 30–36; Brief for United States 15–21. Under the "priority" or "hazard" program, in contrast, diagnostic teams conduct individualized assessments of particular crossings, and state or FHWA officials make specific judgments about the adequacy of the warning devices using the criteria set out in § 646.214(b)(3). See Brief for Respondent 5–7, 34–35; Brief for United States 18–21. They therefore contend that (b)(3) and (4) only apply to devices installed under the "priority" or "hazard" program, when a diagnostic team has actually applied the decisional process mandated by (b)(3). See Brief for Respondent 16; Brief for United States 18–25. Only then has the regulation prescribed a federal standard for the adequacy of the warning devices that displaces state law covering the same subject.

This construction, however, contradicts the regulation's plain text. Sections 646.214(b)(3) and (4) make no distinction between devices installed for "minimum protection" and those installed under a so-called "priority" or "hazard" program. Nor does their applicability depend on any individualized determination of adequacy by a diagnostic team or an FHWA official. Rather, as the FHWA itself explained in its *Easterwood* brief, §§ 646.214(b)(3) and (4) have a "comprehensive scope." Brief for United States in *CSX Transp., Inc.* v. *Easterwood,* O. T. 1992, Nos. 91–790 and 91–1206, at 12. Section 646.214(b)(3) states that its requirements apply to "*any* project where Federal-aid funds participate in the installation of the devices." 23 CFR § 646.214(b)(3)(i) (1999) (emphasis added). And § 646.214(b)(4) applies to all federally funded crossings that do not meet the criteria specified in (b)(3). Either way, the federal standard for adequacy applies to the crossing improvement and "substantially subsume[s] the subject matter of the relevant state law." *Easterwood,* 507 U. S., at 664.

Thus, contrary to the Government's position here, §§ 646.214(b)(3) and (4) "specify warning devices that must be installed" as a part of all federally funded crossing improvements. *Id.,* at 666. Although generally "an agency's construction of its own regulations is entitled to substantial deference," *Lyng* v. *Payne,* 476 U. S. 926, 939 (1986), no such deference is appropriate here. Not only is the FHWA's interpretation inconsistent with the text of §§ 646.214(b)(3) and (4), see *Robertson* v. *Methow Valley Citizens Council,* 490 U. S. 332, 359 (1989), but it also contradicts the agency's own previous construction that this Court adopted as authoritative in *Easterwood,* cf. *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.,* 497 U. S. 116, 131 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning").

The dissent contends that, under our holding, state law is pre-empted even though "[n]o authority, federal or state, has found that the signs in place" are "adequate to protect safety." *Post*, at 360 (opinion of GINSBURG, J.). This presupposes that States have not fulfilled their obligation to comply with §§ 646.214(b)(3) and (4). Those subsections establish a standard for adequacy that States are required to follow in determining what devices to install when federal funds are used. The dissent also argues that *Easterwood* did not hold that federal funding of the devices is "sufficient" to effect pre-emption, and that "any statement as to the automatic preemptive effect of federal funding should have remained open for reconsideration in a later case." *Post*, at 361. But *Easterwood* did not, in fact, leave this question open. Instead, at the behest of the FHWA, the Court clearly stated that §§ 646.214(b)(3) and (4) pre-empt state tort claims concerning the adequacy of *all* warning devices installed with the participation of federal funds.

Respondent also argues that pre-emption does not lie in this particular case because the Oakwood Church Road crossing presented several of the factors listed in § 646.214(b)(3), and because the TDOT did not install pavement markings as required by the MUTCD. See Brief for Respondent 20–22, 36; Brief in Opposition 6–8. This misconceives how pre-emption operates under these circumstances. When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates "the devices to be installed and the means by which railroads are to participate in their selection." *Easterwood, supra*, at 671. It is this displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the

MUTCD, that pre-empts state tort actions. Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question.

It should be noted that nothing prevents a State from re-visiting the adequacy of devices installed using federal funds. States are free to install more protective devices at such crossings with their own funds or with additional funding from the FHWA. What States cannot do—once they have installed federally funded devices at a particular crossing—is hold the railroad responsible for the adequacy of those de-vices. The dissent objects that this bestows on railroads a "double windfall": The Federal Government pays for the in-stallation of the devices, and the railroad is simultaneously absolved of state tort liability. *Post,* at 360–361. But the same is true of the result urged by respondent and the Gov-ernment. Respondent and the Government acknowledge that §§ 646.214(b)(3) and (4) can pre-empt state tort law, but they argue that pre-emption only occurs when the State has installed the devices pursuant to a diagnostic team's analysis of the crossing in question. Under this reading, railroads would receive the same "double windfall"—federal funding of the devices and pre-emption of state tort law—so long as a diagnostic team has evaluated the crossing. The supposed conferral of a "windfall" on the railroads therefore casts no doubt on our construction of the regulation.

Sections 646.214(b)(3) and (4) "cover the subject matter" of the adequacy of warning devices installed with the partici-pation of federal funds. As a result, the FRSA pre-empts respondent's state tort claim that the advance warning signs and reflectorized crossbucks installed at the Oakwood Church Road crossing were inadequate. Because the TDOT used federal funds for the signs' installation, §§ 646.214(b)(3) and (4) governed the selection and installation of the devices. And because the TDOT determined that warning devices

other than automatic gates and flashing lights were appropriate, its decision was subject to the approval of the FHWA. See § 646.214(b)(4). Once the FHWA approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby preempting respondent's claim.

The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, concurring.

I agree with JUSTICE GINSBURG that "common sense and sound policy" suggest that federal *minimum* safety standards should not pre-empt a state tort action claiming that in the particular circumstance a railroad's warning device remains inadequate. *Post*, at 360 (dissenting opinion). But the Federal Government has the legal power to do more. And, as the majority points out, *ante*, at 353–356, the specific Federal Highway Administration regulations at issue here do, in fact, do more—when read in light of *CSX Transp., Inc.* v. *Easterwood*, 507 U. S. 658 (1993), which faithfully replicates the Government's own earlier interpretation. So read, they say that once federal funds are requested and spent to install warning devices at a grade crossing, the regulations' standards of adequacy apply across the board and pre-empt state law seeking to impose an independent duty on a railroad with respect to the adequacy of warning devices installed. *Id.*, at 671; *ante*, at 357. I see no need here to reconsider the relevant language in this Court's earlier opinion because the Government itself can easily avoid the pre-emption that it previously sought. It can simply change the relevant regulations, for example, by specifying that federal money is sometimes used for "minimum," not "adequate," programs, which minimum programs lack pre-emptive force. The

agency remains free to amend its regulations to achieve the commonsense result that the Government itself now seeks. With that understanding, I join the majority's opinion.

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, dissenting.

A fatal accident occurred on October 3, 1993, at a railroad crossing in Gibson County, Tennessee. The crossing was equipped not with automatic gates or flashing lights, but only with basic warning signs installed with federal funds provided under the Federal Railway-Highway Crossings Program. See 23 U. S. C. § 130. This federal program aimed to ensure that States would, "[a]t a minimum, . . . provide signs for all railway-highway crossings." § 130(d). No authority, federal or state, has found that the signs in place at the scene of the Gibson County accident were adequate to protect safety, as distinguished from being a bare minimum. Nevertheless, the Court today holds that wholesale federal funding of improvements at 196 crossings throughout 11 west Tennessee counties preempts all state regulation of safety devices at each individual crossing. As a result, respondent Dedra Shanklin cannot recover under state tort law for the railroad's failure to install adequate devices. And the State of Tennessee, because it used federal money to provide at least minimum protection, is stopped from requiring the installation of adequate devices at any of the funded crossings.

The upshot of the Court's decision is that state negligence law is displaced with no substantive federal standard of conduct to fill the void. That outcome defies common sense and sound policy. Federal regulations already provide that railroads shall not be required to pay any share of the cost of federally financed grade crossing improvements. 23 CFR § 646.210(b)(1) (1999). Today the railroads have achieved a double windfall: the Federal Government foots the bill for installing safety devices; and that same federal expenditure

spares the railroads from tort liability, even for the inadequacy of devices designed only to secure the "minimum" protection Congress envisioned for all crossings. See 23 U. S. C. § 130(d). Counsel for petitioner Norfolk Southern Railway correctly conceded at oral argument that the relevant statutes do not compel releasing the railroads when the devices installed, though meeting federal standards for "minimum" protection, see *ante*, at 350, fail to provide adequate protection. The road is open for the Secretary of Transportation to enact regulations clarifying that point. See *ante*, at 359–360 (BREYER, J., concurring).

As persuasively explained by the Court of Appeals for the Seventh Circuit in *Shots* v. *CSX Transp., Inc.*, 38 F. 3d 304 (1994) (Posner, C. J.), and reiterated by the Court of Appeals for the Sixth Circuit in the instant case, 173 F. 3d 386 (1999), our prior decision in *CSX Transp., Inc.* v. *Easterwood*, 507 U. S. 658 (1993), does not necessitate the ouster of state law the Court now commands. *Easterwood*, in which the tort claimant prevailed, dispositively held only that federal funding was necessary to trigger preemption, not that it was sufficient by itself to do so. Because federal funds did not in fact subsidize the crossing at issue in that case, *id.*, at 671–673, any statement as to the automatic preemptive effect of federal funding should have remained open for reconsideration in a later case where federal funds did participate. I do not read the admittedly unclear language of 23 CFR §§ 646.214(b)(3) and (4) (1999) to dictate that Federal Highway Administration authorization of federal funding to install devices is tantamount to approval of each of those devices as adequate to protect safety at every crossing so funded. And I do not think a previous administration's argument to that effect as *amicus curiae* in *Easterwood* estops the Government from taking a different view now. I agree with the sound reasoning in *Shots* and would affirm the Court of Appeals' judgment.