Richard A. RANDALL, and Virginia
Randall, Appellants–Plaintiffs,

v.

NORFOLK SOUTHERN RAILWAY
CO., and Doug Wylie, Appellees–
Defendants.

No. 18A02–0305–CV–421.

Court of Appeals of Indiana.

Dec. 30, 2003.

Transfer Denied March 25, 2004.

Daniel J. Harrigan, Bayliff Harrigan
Cord & Maugans, Kokomo, IN, Bruce N.

attorneys to consider whether their differ-ences may be resolved through mediation.

Munson, Muncie, IN, Attorneys for Appellants.

David A. Locke, John C. Duffey, Stuart & Branigin, LLP, Lafayette, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

This case involves a daytime grade-crossing collision at the intersection of Norfolk Southern Railway Co.'s single mainline track and McGalliard Road in Muncie, Indiana. Richard and Virginia Randall (referred to collectively as Randall) appeal the trial court's grant of summary judgment in favor of Norfolk Southern Railway Co. and Norfolk's engineer, Doug Wylie, (referred to collectively as the Railroad) on Randall's negligence complaint. Randall presents the following consolidated and restated issues for review:

1. Did the trial court properly determine that the installation of federally funded warning devices at the grade crossing preempts Randall's claims that the Railroad had a duty to petition the State Department of Transportation to upgrade protection at the crossing and a duty to petition the Muncie Street Department to reconfigure the interconnected traffic signal?

2. Did the trial court properly determine that the Railroad's compliance with the federally prescribed speed limit preempts Randall's claim that the Railroad had a duty to reduce its train's speed because of the allegedly extra hazardous conditions at the crossing?

3. Did the trial court properly determine that the evidence establishes

as a matter of law that the train's whistle was sounded in compliance with statute?

We affirm.[1]

Shortly before 10:00 a.m. on May 24, 2001, Richard Randall was driving his pickup truck north on Broadway Avenue, approaching the point where Broadway intersects with McGalliard Road. The Railroad operates a line of track that runs parallel with Broadway and intersects with McGalliard within about sixty feet of the western edge of Broadway. On the day of the accident, the Railroad was operating a freight train northbound on the track approaching the McGalliard grade crossing. After stopping at the intersection of McGalliard and Broadway, Randall proceeded to turn west onto McGalliard and, despite several warning signals, immediately drove into the path of the oncoming train. The truck was thrown into a ditch on the other side of the track.

On the day in question, pavement markings in the left-turn lane on Broadway warned motorists who were preparing to turn left (or west) onto McGalliard that they were approaching a railroad crossing. In addition, the grade crossing was equipped with crossbuck signs and train-activated warning devices that included a bell, overhead flashing light signals on cantilever arms, and a pair of flashing light signals aimed toward the left-turn lane on Broadway. The traffic lights at the Broadway and McGalliard intersection were also interconnected with and preempted by the crossing warning devices. The City of Muncie programmed these traffic lights so that they flashed red in all four directions when a train approached the crossing. The State of Indiana used federal funds to install the warning devices (including the intercon-

1. Oral argument was held in Indianapolis on November 5, 2003.

nected traffic lights) for this grade crossing several years prior to Randall's accident under a project approved by the Federal Highway Administration.

On February 5, 2002, Richard Randall and his wife, Virginia, filed suit against the Railroad, claiming that his injuries were caused by the Railroad's negligence. Virginia asserted a derivative claim for loss of consortium. The Railroad moved for summary judgment on November 6, 2002. Following a hearing, the trial court granted summary judgment in favor of the Railroad on April 21, 2003. Randall now appeals. Additional facts will be provided as necessary.

Our standard of review in this regard is well settled:

> In an appeal involving summary judgment, the appealing party bears the burden of persuasion, and we assess the trial court's decision to ensure that the parties were not improperly denied their day in court. We analyze the issues, however, in the same way as a trial court would. A party seeking summary judgment must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The movant must designate sufficient evidence to eliminate any genuine factual issues, and once the movant has done so, the burden shifts to the nonmovant to come forth with contrary evidence. The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the non-movant, and resolve all doubts against the moving party.

*Shambaugh & Son, Inc. v. Carlisle*, 763 N.E.2d 459, 460–61 (Ind.2002) (some citations omitted). Additionally, when the material facts are not in dispute, our review is limited to the determination of whether the trial court correctly applied the law to the undisputed facts. *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447 (Ind. Ct.App.2000).

### 1.

Randall initially argues that the Railroad had a duty to petition the State and local public authorities to correct or upgrade protections at the "extra hazardous" McGalliard grade crossing in order to make it reasonably safe.[2] *Appellants' Brief* at 9. Randall acknowledges that the use of federal funds to install warning devices at the crossing released the Railroad of the duty to upgrade the crossing protections to include crossing gates at the Railroad's expense. Randall asserts, however:

> the railroad continues to have a duty to the monitor its crossing and when it is apparent that a more then [sic] ordinarily hazardous crossing exists to take action and petition the Department of Transportation to make the necessary upgrade to the protection at the crossing, including the installation of crossing gates, where necessary to make the grade crossing reasonably safe.

*Id.* at 10. In a related argument, Randall also claims that the Railroad had a duty to petition the Muncie Street Department to reprogram the interconnected traffic lights to display a static red signal rather than a flashing red signal as a train approached the crossing.

---

2. Randall notes that the crossing has been the scene of seventeen collisions between trains and motor vehicles since 1979 and that train crews have reported at least twenty-five near misses at that location between April 1993 and February 2000. Randall describes the crossing as a "relentless stream of mayhem, carnage and reported close calls". *Appellants' Brief* at 12.

In *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the United States Supreme Court specifically addressed the preemptive effect of the Federal Railroad Safety Act of 1970 (the FRSA)[3] on negligence suits against railroads. After detailing the purpose and history of the FRSA, including various safety regulation issued by the Secretary of Transportation, the Court concluded:

> In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations [23 C.F.R. §§ 646.214(b)(3) and (4) ] therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*Id.* at 671, 113 S.Ct. 1732. Therefore, where these regulations are applicable, the court held that state tort law is preempted. *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387.

Despite *Easterwood,* there remained a conflict in the circuit courts as to whether the FRSA, by virtue of 23 C.F.R. §§ 646.214(b)(3) and (4), preempted state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds had participated in the installation of the devices. Therefore, in *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000), the Supreme Court addressed once again the preemptive effect of the FRSA in conjunction with these regulations. The Court provided a useful overview of the FRSA and subsequent enactments and regulations related thereto:

In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety," § 20103(a), and directs the Secretary to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem," § 20134(a). The FRSA also contains an express pre-emption provision, which states:

> "Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement." § 20106.

\* \* \*

Three years after passing the FRSA, Congress enacted the Highway Safety Act of 1973, § 203, 87 Stat. 283, which, among other things, created the Federal Railway–Highway Crossings Program (Crossings Program), *see* 23 U.S.C. § 130. That program makes funds available to States for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." § 130(a).

\* \* \*

The Secretary, through the Federal Highway Administration (FHWA), has

---

**3.** 49 U.S.C. § 20101 *et seq.*

promulgated several regulations implementing the Crossings Program. One of those regulations, 23 C.F.R. § 646.214(b) (1999), addresses the design of grade crossing improvements. More specifically, §§ 646.214(b)(3) and (4) address the adequacy of warning devices installed under the program. According to § 646.214(b)(3), "[a]dequate warning devices ... on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals" if any of several conditions are present. Those conditions include (A) "[m]ultiple main line railroad tracks," (B) multiple tracks in the vicinity such that one train might "obscure the movement of another train approaching the crossing," (C) high speed trains combined with limited sight distances, (D) a "combination of high speeds and moderately high volumes of highway and railroad traffic," (E) the use of the crossing by "substantial numbers of schoolbuses or trucks carrying hazardous materials," or (F) when a "diagnostic team recommends them." § 646.214(b)(3)(i). Subsection (b)(4) states that "[f]or crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." Thus, at crossings where any of the conditions listed in (b)(3) exist, adequate warning devices, if installed using federal funds, are automatic gates and flashing lights. And where the (b)(3) conditions are not present, the decision of what devices to install is subject to FHWA approval. *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. at 347–49, 120 S.Ct. 1467. "Sections 646.214(b)(3) and (4) therefore establish a standard of adequacy that 'determine[s] the devices to be installed when federal funds participate in the crossing improvement project.'" *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. at 354, 120 S.Ct. 1467 (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. at 671, 113 S.Ct. 1732).

The Court proceeded to explain how preemption operates under these circumstances:

When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates "the devices to be installed and the means by which railroads are to participate in their selection." *Easterwood, supra,* at 671, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387. It is this displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the MUTCD, that preempts state tort actions. *Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question.*

It should be noted that nothing prevents a State from revisiting the adequacy of devices installed using federal funds. States are free to install more protective devices at such crossings with their own funds or with additional funding from the FHWA. *What States cannot do—once they have installed federally funded devices at a particular*

crossing—is hold the railroad responsible for the adequacy of those devices. *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. at 357–58, 120 S.Ct. 1467 (emphases supplied).

■ In light of *Easterwood* and *Shanklin,* it is evident that the issue of whether a grade crossing has become "extra hazardous" is irrelevant in determining a railroad's civil liability where, as in the instant case, warning devices have been installed with federal funds under a project approved by the FHWA.[4] Moreover, Randall's attempt to avoid preemption by casting his negligence claims in terms of duties to petition is not effective, as such claims ultimately amount to an effort to hold the Railroad responsible for the adequacy of the warning devices. As the supreme court has made clear, once a state has installed federally funded devices at a particular crossing, the state is preempted from "impos[ing] an independent duty on a railroad to identify and/or repair dangerous crossings." *CSX Transp., Inc. v. Easterwood,* 507 U.S. at 671, 113 S.Ct. 1732; *see also Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374. Thus, the trial court properly determined that federal law preempts Randall's duty-to-petition claims.[5]

## 2.

■ Randall next argues that the Railroad had a duty to stop the train, flag the crossing, and then proceed at a reduced speed of 15 miles per hour as it approached the crossing because the Railroad knew or should have known that the turn signals at McGalliard were "malfunctioning". *Appellants' Brief* at 33. Randall relies on federal regulations and the Railroad's own operating rules for the proposition that "when there is an activation failure or malfunction, the train crew must be given a stop and flag order to protect the motoring public at the crossing where the malfunction is occurring." *Id.* at 32.

We observe that there is no evidence in the record suggesting that the traffic lights were malfunctioning. Rather, the undisputed evidence reveals that the lights were functioning precisely as intended and programmed by the City. Moreover, the federal regulations that Randall relies upon, 49 C.F.R. §§ 234.105 and 234.107, apply to situations where there is an activation failure or a false activation of the

---

4. This does not mean that a railroad has no obligation to assist state and local authorities once warning devices have been installed at a crossing with federal funds. As the Railroad acknowledges, it still has "an obligation to provide current and complete information about its crossings, and to cooperate if the State later decides to install additional warning devices with its own funds or with additional funding from the FHWA." *Appellees' Brief* at 18. Under such circumstances, however, state tort law is displaced, and the Railroad may not be held civilly liable for the adequacy of the warning devices at the crossing.

5. It may well be that the warning devices at the grade crossing were inadequate even under the federal regulations themselves. As hereinbefore noted, 23 C.F.R. § 646.214(b) requires automatic gates with flashing light signals if the condition of "high speed trains combined with limited sight distances" exists. Here, there were no automatic gates and it was established that although this particular train was traveling at an approximate speed of 20 m.p.h., the federal regulations permitted a train speed of 60 m.p.h. at this location. Furthermore, it is clear that the railroad crossing was only 60 feet from the point at which vehicles turned onto McGalliard, thus creating a limited sight distance. Although the arguable inadequacy of the warning and protective devices at the site in violation of the federal regulations themselves may reflect adversely upon the federal government's approval of the devices installed and upon the State and local governments, such cannot in any way impose liability upon the Railroad.

warning system at the crossing. These terms are specifically defined in 49 C.F.R. § 234.5 as follows:

> "Activation failure" means the failure of an active highway-rail grade crossing warning system to indicate the approach of a train at least 20 seconds prior to the train's arrival at the crossing, or to indicate the presence of a train occupying the crossing, unless the crossing is provided with an alternative means of active warning to highway users of approaching trains. (This failure indicates to the motorist that it is safe to proceed across the railroad tracks when, in fact, it is not safe to do so.) A grade crossing signal system does not indicate the approach of a train within the meaning of this paragraph if—more than 50% of the flashing lights (not gate arm lights) on any approach lane to the crossing are not functioning as intended, or in the case of an approach lane for which two or more pairs of flashing lights are provided, there is not at least one flashing light pair operating as intended. Back lights on the far side of the crossing are not considered in making these determinations.

> \* \* \*

> "False activation" means the activation of a highway grade crossing warning system caused by a condition that requires correction or repair of the grade crossing warning system. (This failure indicates to the motorist that it is not safe to cross the railroad tracks when, in fact, it is safe to do so.)

The federal regulations that Randall relies upon are plainly inapplicable here because there is no evidence of an activation failure or a false activation.

Furthermore, it is undisputed that the train was traveling well below the federally prescribed maximum speed for its class of track. *See* 49 C.F.R. § 213.9(a) (prescribes the maximum speed at which trains may be operated on various classes of track). "49 CFR § 213.9(a) precludes additional state regulation of train speeds and, therefore, preempts state tort law claims based on excessive speed when the federal speed limit has not been violated." *Estate of Martin by Martin v. Consol. Rail Corp.*, 620 N.E.2d 720, 723 (Ind.Ct. App.1993) (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387), *trans. denied.* In light of such preemption, the trial court properly granted summary judgment on Randall's excessive speed claim.

### 3.

■ Finally, Randall argues that an issue of fact remains as to whether the train's whistle was sounded in compliance with statute. Randall specifically argues, "there is no evidence, apart from the testimony of the train crew, that the whistle was sounded as required by statute." *Appellants' Brief* at 25–26.

Ind.Code Ann. § 8–6–4–1 (West, PREMISE through 2003 1st Regular Sess.) provides in relevant part:

> (a) A railroad company operating in this state shall equip every locomotive engine with a whistle and a bell, maintained in good working order, such as are used by other railroad companies. Except when approaching a crossing to which an ordinance adopted under subsection (c) applies, the engineer or other person in charge of or operating an engine upon the line of a railroad shall, when the engine approaches the crossing of a turnpike, public highway, or street in this state, beginning not less than one-fourth (1/4) mile from the crossings:
>
> > (1) sound the whistle on the engine distinctly not less than four (4) times,

which sounding shall be prolonged or repeated until the crossing is reached; and

(2) ring the bell attached to the engine continuously from the time of sounding the whistle until the engine has fully passed the crossing.

In the instant case, the train's engineer, Wylie, testified by deposition that he began sounding the whistle when the lead locomotive crossed Streeter Avenue and sounded it repeatedly until the train reached McGalliard. Streeter is approximately 1780 feet (i.e., over one-forth of a mile) south of McGalliard. Wylie testified further that the train's ditch lights flash for a period of time after the whistle is sounded and that these lights otherwise are on but do not flash. Finally, Wylie noted that the train's whistle, bell, and lights were all working properly that day.

In addition to Wylie's testimony, the Railroad introduced declarations from two eyewitnesses to the accident in support of its motion for summary judgment on Randall's whistle claim. Lynn Potter's declaration provides in relevant part:

3. Just before the accident, I was heading north on Granville Avenue toward McGalliard; as I was turning right onto McGalliard, I saw the signal lights at the crossing flashing and realized I was going to have to wait for a train.

\* \* \*

5. As I sat there waiting for the train, I watched the signal lights at the crossing continue to flash, and I also heard the crossing bell ringing.

6. I saw the train coming from my right; it was going slowly, and *I heard the engineer blow the horn at least four times as the train approached the crossing on McGalliard.*

\* \* \*

*Appellants' Appendix* at 136–37 (emphasis supplied). Curtis Crabtreee also witnessed the events leading up to and including the accident. Crabtree's declaration provides in part:

3. Just before the accident, I was heading south on Broadway into Muncie, and I was planning to turn left on McGalliard and go to the K–Mart store.

4. As I approached the intersection at Broadway and McGalliard, I noticed that the traffic lights were flashing "stop" for all four directions, and I saw a train heading north toward the crossing on McGalliard. I could see the train even before I came to a stop in the left-turn lane on Broadway.

5. I saw the railroad crossing lights were flashing, and I could hear the crossing bell ringing even though I had my windows rolled up.

6. As I waited to turn east on McGalliard, I could see the headlights on the front of the engine shining, and *I also saw the two white lights down lower on the engine; the lower lights were flashing from the very first time I saw the train.*

7. *I could also hear the train's horn sounding loud and clear as the train headed toward the crossing on McGalliard; I heard the train's horn blow several times.*

\* \* \*

*Id.* at 138–39 (emphases supplied).

While the above declarations do not speak to the train's precise distance from the crossing when the first whistle was sounded, the declarations in no way contradict or call into question Wylie's testi-

mony in this regard. Rather, the declarations establish that the whistle (also referred to as a horn) was sounded loud and clear at least four times. In fact, Crabtree observed the ditch lights flashing (indicating the whistle had already been sounded) when he first saw the train as he approached the intersection at Broadway and McGalliard. We simply cannot agree with Randall that these declarations in any way support the claim that the whistle was untimely sounded.[6]

Moreover, Randall's deposition testimony does not create a question of fact regarding the timeliness of the whistle. To be sure, "testimony of one who is near a crossing and in a situation to have heard the whistle, that he did not hear it, is generally sufficient to support the inference that such a warning signal was not given." *Callahan v. New York Cent. R. Co.*, 125 Ind.App. 631, 639, 125 N.E.2d 263, 267 (1955); *see also Pennsylvania R. Co. v. Rizzo*, 119 Ind.App. 505, 86 N.E.2d 91 (1949). Further, "[w]hile negative evidence may not have the same probative value as positive evidence it is usually the only method of proving the failure of a railway company to give signals and . . . is evidence which the jury may properly weigh and consider, together with positive evidence, if any, to the contrary, in determining whether such signals were given." *Bartley v. Chicago & E.I. Ry. Co.*, 216 Ind. 512, 522, 24 N.E.2d 405, 409 (1939).

Here, however, Randall failed to present definite testimony that he did not hear the sounding of the train's whistle. Rather, Randall's testimony simply reveals that he cannot remember whether he heard the whistle or observed other warning signals at the crossing:

Q. As you approached the stoplight there at McGalliard and Broadway, do you remember whether the light was red or green?

A. I don't remember seeing the light at all. I just remember driving following traffic and thinking about getting fuel. That's the only mental thought I have about it.

Q. Do you remember whether you had to stop for the light when you were in the left turn lane waiting to turn onto McGalliard?

A. I don't remember. I don't remember.

Q. So you can't say as we sit here today whether you had to wait at all when you approached McGalliard; is that fair to say?

A. I don't remember any further details on this at all. I honestly don't.

\* \* \*

Q. Do you remember whether there were any cars or vehicles in front of you in the left turn lane on Broadway?

A. I don't remember. I honestly don't.

Q. Do you have any memory, Mr. Randall, of actually turning onto McGalliard?

A. No, I do not.

Q. When you saw the Speedway promotional there, the reduced prices on gas, and made a decision that you were going to go over there and get some gas, do you recall being aware that the crossing was there?

6. Randall asserts as "fact" that Crabtree and Potter *"did not hear* the whistle sounding from a point 1320 feet south of the crossing". *Appellants' Brief* at 10 (emphasis in original). This assertion is erroneous in that these witnesses made no such statement in their declarations, nor can such "fact" be reasonably inferred from their declarations.

A. I don't know whether I was aware of that. I can't—I don't know.

Q. Do you have any recollection of stopping at the crossing there on McGalliard?

A. No.

Q. Do you remember seeing the flasher lights at the crossing operating?

A. No.

Q. Do you remember if you specifically looked for a train as you approached the crossing?

A. No.

Q. Do you have any memory of at some point becoming aware of the train and slamming on your brakes?

A. No.

Q. Do you remember hearing the train's horn?

A. No, I do not.

\* \* \*

Q. Mr. Randall, I'll submit to you that the evidence in this case will be that the crossing lights were flashing, the crossing warning bell was sounding, and the engineer was sounding the train's horn for a significant period of time before the accident. Do you have any reason to disbelieve those witnesses' statements?

A. I don't recall any of that happening. That's all I can testify to.

*Appellants' Appendix* at 73–75, 458–59. Randall's lack of memory regarding

whether he heard the train's whistle does not amount to negative evidence tending to establish that the whistle was not sounded.[7] A finding that the whistle was not blown based upon this testimony "could be the result only of speculation, surmise and conjecture." *Pennsylvania R. Co. v. Rizzo*, 86 N.E.2d at 93 (finding insufficient evidence to support jury verdict in favor of plaintiff where witness could not recall whether or not he heard a whistle prior to hearing the collision). Therefore, the trial court correctly determined as a matter of law that the Railroad timely sounded its whistle and properly entered summary judgment accordingly.

Judgment affirmed.

RILEY, J., and SULLIVAN, J., concur.

---

7. This is significantly different than testimony that he was listening but did not hear the whistle. *See, e.g., Bartley v. Chicago & E.I. Ry. Co.*, 216 Ind. 512, 24 N.E.2d 405 (finding probative negative evidence where plaintiff testified that as he approached the crossing he was listening but heard no signals of an approaching train and where some witnesses who were in a position where they should have heard a signal if it had been given, testified that they heard no such signal); *Callahan v. New York Cent. R. Co.*, 125 Ind.App. 631, 125 N.E.2d 263 (witness testified he was observing the train prior to the collision, the train did not whistle for the crossing, and witness did not hear any bells ringing at any time).