ATTORNEY FOR APPELLANTS
Charles P. Rice
South Bend, Indiana

ATTORNEYS FOR APPELLEE
J. Thomas Vetne
Colin J. Reilly
Robert M. Edwards, Jr.
South Bend, Indiana

# In the
# Indiana Supreme Court



No. 71S03-1506-CT-350

JASON AND JUSTINA KRAMER,

*Appellants (Plaintiffs below),*

v.

CATHOLIC CHARITIES OF THE DIOCESE OF
FORT WAYNE-SOUTH BEND, INC.,

*Appellee (Defendant below).*

Appeal from the St. Joseph Circuit Court, No. 71C01-1104-CT-53
The Honorable Michael G. Gotsch, Sr., Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 71A03-1308-CT-301

**June 3, 2015**

**Massa, Justice.**

E. is a baby girl lucky enough to be wanted by two sets of parents: her biological father, R.M., and her prospective adoptive parents, Jason and Justina Kramer. Unfortunately for the Kramers, our legal system gives priority to the rights of biological parents over adoptive parents, and the Kramers were forced to give up E. shortly after Christmas, having had custody for the first eight months of E.'s life. The Kramers then turned their understandable anguish upon Catholic

Charities, the agency they had hired to facilitate the adoption, alleging Catholic Charities should have checked the putative father registry prior to placing E. with them, or alternatively, that Catholic Charities had a duty to disclose to the Kramers its failure to conduct a pre-placement check of the registry. Because the applicable Indiana statute does not impose the requirement of a pre-placement registry check, and because the Kramers failed to demonstrate that Catholic Charities had any duties in excess of its statutory obligations, we affirm the trial court's grant of summary judgment.

**Facts and Procedural History**

Catholic Charities is a not-for-profit organization, which serves as an intermediary between adoptive parents, children, and parents putting children up for adoption. The Kramers first contacted Catholic Charities in the summer of 2009, seeking to adopt a child. Before it would act as their agent, Catholic Charities required the Kramers to review the "Client Handbook," which spells out the rights and responsibilities of both parties with respect to the potential adoption, and to sign an acknowledgment of receipt. One of those rights was to "obtain[] information about the risks and benefits . . . of services they will receive." App. at 262. The Kramers also agreed in their contract with Catholic Charities to provide "honest and complete information"; Catholic Charities in return agreed to "be honest and forthcoming in all phases of the adoption process." App. at 212. Catholic Charities also expressly reserved the right to revise its policies and practices at any time. The Kramers paid $1,300 to be included in the pool of adoptive parents, and they agreed to pay an $8,000 service fee in exchange for the successful completion of an adoption.

At one of their early meetings, Catholic Charities also verbally warned the Kramers there was a possibility that, even if a mother put her child up for adoption, a father could still claim custody. Indiana affords potential fathers an opportunity to claim parentage of a child beyond the mother's disclosure via the putative father registry, maintained by the Indiana Department of

2

Health.  Ind. Code § 31-19-5-2 (2008).  The express statutory purpose of the putative father registry "is to determine the name and address of a father" of a child prior to adoption, "so that notice of the adoption may be provided to the putative father."  Ind. Code § 31-19-5-3 (Supp. 2014). Putative fathers have up to 30 days after a child's birth to register, including any time prior to the child's birth.  Ind. Code § 31-19-5-12 (2008).  Once an adoption petition is filed, adoption agencies are required to request a check of the registry at least one day after the close of the father's 30-day deadline, but agencies are permitted to request a registry check at any time.  Ind. Code § 31-19-5-15(b) (Supp. 2014).

At the time the Kramers contacted Catholic Charities, it had a written internal policy to check the putative father registry one day after the expiration of the registration deadline, consistent with the applicable statute.  It also had an unwritten practice of checking the putative father registry twice more *before* the statutory deadline:  once after intake of the birthmother as a client, and again right before placement of the child with the potential adoptive family.  This additional practice was not "mandated" by Catholic Charities nor was it approved by its Board of Governors.  App. at 455.

Catholic Charities did not disclose to the Kramers either the written policy or the informal practice; Catholic Charities simply warned the Kramers that a putative father could register at any time prior to the expiration of the 30-day post-birth deadline.

In March of 2010, M.S., while eight months pregnant, contacted Catholic Charities about giving up her unborn child for adoption.  M.S. indicated there were two potential fathers, but she declined to give any names.  Catholic Charities introduced M.S. to the Kramers, and M.S. told Catholic Charities that she would like the Kramers to adopt her child.  M.S. gave birth to E. on May 1st and signed paperwork agreeing to the adoption on May 2nd.  The Kramers took E. home with them on May 3rd.

3

On May 25th and again on June 1st, Catholic Charities requested that the Indiana Department of Health check whether anyone had registered as the putative father of E. The first search revealed no registered putative fathers, as sworn by the IDOH administrator of the putative father registry. The second search revealed R.M. had registered as the putative father of E. on April 27th.[1] Neither party nor IDOH can explain why R.M.'s registration was not discovered in the first search.

Despite learning of R.M.'s registration, the Kramers petitioned to adopt E., and R.M. contested the adoption. R.M. conclusively established paternity by DNA test, and he received full custody of E. in early January of 2011. By that point the Kramers had custody of E. for over eight months.

The Kramers sued Catholic Charities for negligence, alleging Catholic Charities should have checked the putative father registry prior to placing E. with them, and it should have notified them of its failure to do so. Catholic Charities moved for summary judgment, arguing certain releases executed by the Kramers barred their negligence claim and Catholic Charities had satisfied any duty they owed to the Kramers by complying with the putative father registry statute. The trial court agreed and granted summary judgment for Catholic Charities.

The Kramers appealed, and our Court of Appeals reversed. Kramer v. Catholic Charities of Diocese of Fort Wayne-S. Bend, Inc., 6 N.E.3d 984, 990 (Ind. Ct. App. 2014). Judge Najam, writing for the majority, found summary judgment was inappropriate because the releases in question did not specifically waive a negligence claim, and thus did not bar the Kramers' suit.

---

[1] The Kramers allege—and Catholic Charities concedes—R.M. registered twice, on January 8th and again on April 27th. The documentary evidence, however, only supports the allegedly second registration.

4

Id. at 989. Further, the majority held that although the putative father registry statute does not impose a requirement on adoption agencies to conduct a pre-placement check, "compliance with a statutory standard . . . is not conclusive on the issue" of due care. Id. at 990. Judge Baker dissented, finding that Catholic Charities satisfied its obligations under the applicable Indiana statute, and the releases executed by the Kramers waived any remaining claim of negligence. Kramer, 6 N.E.3d at 990–92 (Baker, J., dissenting).

We now grant Catholic Charities' petition for transfer, thus vacating the opinion below. Ind. Appellate Rule 58(A). We affirm the trial court.

## Standard of Review

Summary judgment is appropriate where "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "The party moving for summary judgment bears the initial burden to establish its entitlement to summary judgment. Only then does the burden fall upon the non-moving party to set forth specific facts demonstrating a genuine issue for trial." Pfenning v. Lineman, 947 N.E.2d 392, 396–97 (Ind. 2011) (internal citations omitted). All evidence, and reasonable inferences drawn from it, must be construed in favor of the non-moving party. Id. at 397. However, "the trial court's judgment arrives on appeal clothed with a presumption of validity, and the challenging party bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law." Williams v. Tharp, 914 N.E.2d 756, 762 (Ind. 2009) (internal quotations omitted). Moreover, where the facts are uncontroverted, our review is de novo as to application of the law, and we will affirm a grant of summary judgment upon any theory supported by evidence in the record. Woodruff v. Ind. Family & Soc. Servs. Admin., 964 N.E.2d 784, 790 (Ind. 2012).

5

Summary judgment is rarely appropriate in negligence cases because they are particularly fact-sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence. Rhodes v. Wright, 805 N.E.2d 382, 387 (Ind. 2004). Nonetheless, summary judgment is appropriate when the undisputed material evidence negates one element of a negligence claim. Id. at 385.

**The Kramers Failed to Demonstrate That Catholic Charities Had Any Duties with Respect to the Putative Father Registry in Excess of Its Statutory Obligations.**

The Kramers allege Catholic Charities committed the tort of negligence, which has three elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. Id. Catholic Charities asserts it "breached no duty" to the Kramers because it checked the putative father registry one day after the close of the registration deadline, in compliance with Indiana Code section 31-19-5-15(b)(1). App. at 53–54. The Kramers respond that such compliance is "legally irrelevant" to the question of standard of care, citing the following passage from Northern Indiana Public Service Co. v. Sell, 597 N.E.2d 329, 331 (Ind. Ct. App. 1992):

> Where the unjustified or unexcused violation of a duty prescribed by statute may constitute negligence per se . . . it does not follow that compliance with a statute or ordinance constitutes the exercise of reasonable care. W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts § 36, p. 233 (5th ed. 1984). "While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue. Such [a] standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." Id. See also Restatement (Second) of Torts § 288C (1965).

App. at 139 (emphasis omitted).

The Kramers overlook, however, that while compliance with statutory standards is not conclusive per se as to lack of negligence, it is certainly *evidence* of lack of negligence. Indeed, our Court of Appeals has held a movant's compliance with statutory requirements is sufficient to award summary judgment on a negligence claim, in the absence of competent evidence designated by the non-movant which would demonstrate either non-compliance or the existence of a higher duty. See, e.g., Randall v. Norfolk S. Ry. Co., 800 N.E.2d 951, 958–60 (Ind. Ct. App. 2003) (affirming summary judgment for defendant railroad company, when uncontroverted evidence demonstrated compliance with state law regarding warning whistles at railroad tracks); Sell, 597 N.E.2d at 334 (holding defendant utility company, which complied with statute and permit requirements by placing utility pole thirteen feet from the roadway, was not negligent toward passenger in car that struck utility pole after driver fell asleep, because passenger did not establish a duty in excess of statutory requirements); Creech v. Se. Ind. R.E.M.C., Inc., 469 N.E.2d 1237, 1242 (Ind. Ct. App. 1984) (holding defendant had "negated the inference of negligence" by demonstrating compliance with industry and state regulations regarding minimum height of power lines, which thus shifted burden to plaintiff to demonstrate a genuine factual issue).

Moreover, the rule articulated in Sell is derived from W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 36, at 233 (5th ed. 1984), which includes the following proviso: "Where there is a normal situation, clearly identical to that contemplated by the statute or regulation, and no special circumstances or danger are involved, it may be found, *and can be ruled as a matter of law*, that the actor has done his full duty by complying with the statute, and nothing more is needed." Id. (emphasis added); see also Restatement (Second) of Torts § 288C & cmt. a (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions," but "where there are no . . . special circumstances, the minimum standard prescribed by the legislation or regulation may be accepted by the triers of fact, or by the court as a matter of law, as sufficient for the occasion.").

7

Here, the parties agree that Catholic Charities complied with Indiana Code section 31-19-5-15 by checking the putative father registry on the 31st day after E.'s birth, the minimum statutory standard for adoption agencies. This constitutes a prima facie showing of both the extent of Catholic Charities' duty with respect to the registry, and Catholic Charities' satisfaction of that duty. Accordingly, the Kramers bear the burden to set forth specific facts showing that there is a genuine issue for trial on the elements of duty and breach. See Ind. Trial Rule 56(E).

The Kramers argue that irrespective of its statutory obligations, Catholic Charities had a duty to check the registry prior to E.'s placement. But they cite no authority or evidence beyond Catholic Charities' informal practice of conducting such pre-placement checks. In Wal-Mart Stores, Inc. v. Wright, this Court ruled such internal practices, standing alone, do not "tend[] to show the degree of care recognized by [the defendant] as ordinary care" because they may be "established for any number of reasons having nothing to do with . . . ordinary care," and thus are only admissible into evidence before a jury "with an express caution that they are merely evidentiary and not to serve as a legal standard." 774 N.E.2d 891, 894–95 (Ind. 2002). [2] We thus find the Kramers failed to raise a genuine issue of fact as to whether Catholic Charities assumed a duty to conduct a pre-placement check of the registry on behalf of the Kramers. See also Yost v. Wabash Coll., 3 N.E.3d 509, 516–18 (Ind. 2014) (awarding summary judgment to defendant college despite plaintiff's designation of evidence that college had "strict policy against hazing and use of the 'Gentlemen's Rule' to guide student behavior," finding such evidence insufficient

---

[2] We note that in some cases an internal company policy could be sufficient to raise a genuine issue of material fact as to duty. However, we are not persuaded that a genuine issue of material fact was established here given that Catholic Charities had complied with its written internal policies and Indiana statutory requirements, and the Kramers rely solely upon Catholic Charities' unwritten practice that was never approved by its Board of Governors. Moreover, the Kramers failed to demonstrate that they were amongst the class of individuals who were even owed a duty under either policy or practice.

8

to show that college assumed the duty to protect plaintiff from hazing by a particular fraternity, since college's "specific undertaking did not extend to direct oversight and control of the behavior of individual student members of the local fraternity," and noting that "where the record contains insufficient evidence to establish such a duty, the court will decide the issue as a matter of law" (internal citations omitted)).

The Kramers also argue Catholic Charities had a duty to disclose its failure to check the registry prior to E.'s placement (in violation of its informal practice to do so) because the Kramers and Catholic Charities were in a fiduciary relationship.[3] "Whether the defendant must conform his conduct to a certain standard for the plaintiff's benefit is a question of law for the court to decide." Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265, 268 (Ind. 2003). This analysis involves balancing three factors: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the injured party, and (3) public policy concerns. Id.; Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991).

With respect to the relationship between the parties, both parties agree Catholic Charities acted as the Kramers' agent with respect to the potential adoption of E.[4] The nature of an agency

---

[3] The Kramers raised this argument in the context of enforceability of the releases, not with respect to the duty of care. We do not address the releases in this opinion, as we find the issue of duty dispositive. In the interest of construing the non-movant's submissions broadly, however, we will consider this argument from the perspective of duty. See Warner Trucking, Inc. v. Carolina Cas. Ins. Co., 686 N.E.2d 102, 104 (Ind. 1997) ("On appellate review, we construe *the pleadings*, affidavits, and designated materials in a light most favorable to the non-movant." (emphasis added)).

[4] "Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate." Alva Elec., Inc. v. Evansville-Vanderburgh Sch. Corp., 7 N.E.3d 263, 268 (Ind. 2014).

relationship is generally determined by the terms of the agreement between the parties.[5] N. Ind. Pub. Serv. Co. v. Bloom, 847 N.E.2d 175, 187 (Ind. 2006); Dep't of Treasury v. Ice Serv., 220 Ind. 64, 68, 41 N.E.2d 201, 203 (1942); Restatement (Third) of Agency § 8.07 (2006).

Here, the Kramers had the right to "obtain[] information about the risks and benefits . . . of services they [would] receive." App at 262. The Kramers also agreed to provide "honest and complete information to Catholic Charities," while Catholic Charities agreed only to "be honest and forthcoming in all phases of the adoption process." App. at 212. Catholic Charities also expressly reserved the right to revise its policies and practices at any time. (App. at 214). Debra Schmidt, the executive director of Catholic Charities, further stated Catholic Charities had a duty to provide truthful and accurate information to the Kramers regarding the adoption process, and to disclose all of the information it was aware of at the time of E.'s placement.

Utterly absent from the record is any indication that Catholic Charities made any of the following representations to the Kramers, in writing or otherwise: (a) a promise to conduct a pre-placement check of the putative father registry; (b) a statement disclosing the existence of Catholic Charities' informal practice of conducting such pre-placement checks; (c) a promise to provide *complete and total* information to the Kramers of Catholic Charities' adoption practices; (d) a false statement regarding Catholic Charities' adoption practices; or (e) a false statement regarding E.'s parentage at any point during the adoption process. Any one of these would have supported an inference that Catholic Charities had a duty to disclose its failure to conduct a pre-placement check of the putative father registry. But Catholic Charities did not assume any

---

[5] The interpretation of the construction or legal effect of an agreement is also a question of law to be determined by the court. Harrison v. Thomas, 761 N.E.2d 816, 818 (Ind. 2002); Zukerman v. Montgomery, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011).

such duty under the terms of its agreement with the Kramers. See Shawnee Const. & Eng'g, Inc. v. Stanley, 962 N.E.2d 76, 86 (Ind. Ct. App. 2011) (finding no contractual duty where agreements at issue did not contain "specific language that the parties clearly intended to charge [defendant] with a specific duty of care for the safety of all employees on the project"), trans. denied, 963 N.E.2d 1124 (Ind. 2012).

The Kramers further assert this duty of disclosure was inherent to the principal-agent relationship. This argument is not without support. See Egan v. Burkhart, 657 N.E.2d 401, 404 (Ind. Ct. App. 1995) (holding a real estate broker, as an agent, has a duty to disclose to the principal all facts within her knowledge which she may learn within the course of the agency that are material to the purposes of the agency "or which might influence the principal's actions in relation thereto" (quoting Mason Produce Co. v. Harry C. Gilbert Co., 194 Ind. 462, 468, 141 N.E. 613, 615 (1924))). A duty of disclosure, however, may be limited by the terms of the agreement between the parties. See Restatement (Third) of Agency § 8.11 n.b (2006) ("A contract between an agent and a principal may enlarge or reduce the agent's duty to use reasonable effort to provide information."); Bloom, 847 N.E.2d at 187 (stating that "employment creates a species of agency relationship," and that employer's duty of disclosure to employee "is derived from the employment relationship and can be varied by agreement"). Accordingly, we find the terms of the parties' agreement limited any inherent duty of Catholic Charities to disclose its compliance or non-compliance with its own informal practices. The relationship between the parties thus weighs against finding a duty of disclosure.

With respect to the reasonable foreseeability of harm, "we examine what forces and human conduct should have appeared likely to come on the scene, and we weigh the dangers likely to flow from the challenged conduct in light of these forces and conduct." Webb, 575 N.E.2d at 997. "Foreseeability does not mean that the exact hazard or precise consequence should have been foreseen, but it also does not encompass anything that might occur." City of Indianapolis Hous. Auth. v. Pippin, 726 N.E.2d 341, 346 (Ind. Ct. App. 2000).

Here, the Kramers claim that if they had known Catholic Charities had not checked the registry prior to placement, they would have delayed placement until such a check had been completed.[6]  Catholic Charities agreed that a birthfather's registration can present an "insurmountable obstacle" to an adoption.  App. at 457.  Thus, assuming that a pre-placement check had revealed R.M.'s registration,[7] the Kramers never would have accepted placement or pursued adoption of E., which would have spared them the harm of developing an emotional bond to a newborn baby girl only to have her taken away.  Accordingly, the injury to the Kramers was reasonably foreseeable based on Catholic Charities' conduct, which favors the imposition of a duty.

With respect to the final element, "what the public policy of a state is must be determined from a consideration of its Constitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort."  Hooks SuperX, Inc. v. McLaughlin, 642 N.E.2d 514, 518 (Ind. 1994) (quoting Hogston v. Bell, 185 Ind. 536, 545, 112 N.E. 883, 886 (1916)).  Our legislature has mandated that adoption agencies serve the essential public function of facilitating placement of children with new parents.  Ind. Code § 31-19-2-12 (Supp. 2014).  Adoption agencies thus have statutory duties to all parties involved.    See, e.g., Ind. Code

---

[6] Although entirely self-serving, we have recently held that such statements in affidavits are still entitled to deference with respect to summary judgment determinations.  See Hughley v. State, 15 N.E.3d 1000, 1005–06 (Ind. 2014).

[7] Catholic Charities notes that the first search on May 25th did not reveal R.M.'s registration, as evidence that a pre-placement check of the registry would not have made any difference.  This argument is unavailing, however, because our review of foreseeability with respect to duty is not narrowly confined to the facts as they occurred, but instead considers what events could reasonably have resulted from Catholic Charities' actions.  See Stoffer, 786 N.E.2d at 269 (declining to take a "narrow" view of the foreseeability element).  Here, it is undisputed that R.M. registered prior to E.'s birth, and thus a pre-placement check of the registry could reasonably have revealed R.M.'s registration.

§ 31-19-7-1 (2008), Ind. Code § 31-19-8-5 (Supp. 2014) and 465 Ind. Admin. Code 2-1.5-3 et seq. (duties to adoptive children with respect to placing them in a proper home); Ind. Code § 31-19-9-1 (duties to birthparents with respect to obtaining informed consent to the adoption); Ind. Code § 31-19-3-1 (2008) and Ind. Code § 31-19-5-15(b) (Supp. 2014) (duties to putative fathers regarding notification of the potential adoption); Ind. Code §§ 31-19-17-2, -4 (Supp. 2014) (duties to adoptive parents regarding disclosure of pertinent medical and psychological information of the birthparents and the child).

Against this statutory backdrop, public policy considerations cut in both directions. On the one hand, forcing adoption agencies in general to disclose every instance of compliance or non-compliance with their internal procedures could impose significant administrative costs and diminish adoption agencies' collective ability to perform this vital public service. Moreover, given the degree of regulation to which Catholic Charities is already subjected by statute, we are reticent to impose additional, heightened requirements as a matter of common law.[8] Cf. Koske v. Townsend Eng'g Co., 551 N.E.2d 437, 442 (Ind. 1990) (declining to apply a common-law rule regarding strict liability claims in light of the 1978 Product Liability Act, reasoning that "the legislature entered, occupied, and preempted the field of product strict liability in tort"). On the other hand, it is plausible that such a disclosure in this case would have prevented the emotional harm suffered by the Kramers. And given that Catholic Charities already had an informal practice of conducting pre-placement registry checks, the burden of informing the Kramers of its non-compliance with that practice seems relatively minimal. Accordingly, public policy

---

[8] The legislature, of course, has the power to impose broader duties on adoption agencies, including a requirement to check the putative father registry prior to placement of a child with potential adoptive parents if the father is unknown, if it so chooses.

13

considerations neither favor nor weigh against the imposition of a duty of disclosure under these circumstances.

The three-factor test for imposition of a duty under these circumstances is thus equally split. The Kramers, however, bore the burden of persuasion. Ind. Trial Rule 56(E); Williams, 914 N.E.2d at 762. Accordingly, the Kramers failed to demonstrate that Catholic Charities had any duties with respect to the putative father registry in excess of statutory requirements.[9]

**Conclusion**

For the foregoing reasons, the trial court's grant of summary judgment in favor of Catholic Charities dismissing the Kramers' complaint is affirmed.

Rush, C.J., and Rucker, David, JJ., concur.
Dickson, J., dissents with separate opinion.

---

[9] As a final note, with respect to Catholic Charities' conduct, the Kramers do not assert that Catholic Charities lied to them, or that Catholic Charities failed to inform them of a risk to E.'s placement, as they concede that they were repeatedly informed both before and after the placement that a putative father might come forward. Rather, the Kramers assert that Catholic Charities failed to inform them that: (1) Catholic Charities had the ability to check the putative father registry prior to the statutory deadline; and (2) Catholic Charities did not so check the registry, in contravention of its informal practice to do so. Thus the Kramers do not actually assert that Catholic Charities breached any of its recognized duties; they are in fact asserting Catholic Charities had a separate and distinct duty to provide the omitted information, and as discussed above, we do not believe the Kramers demonstrated Catholic Charities owed them such a duty under the circumstances. Only after determining that such a duty exists does it become necessary to reach the questions raised by the dissent, specifically: (1) the degree of care required for the particular duty in question, which as the dissent correctly states, is always that care which is reasonable under the circumstances (see Stoffer, 786 N.E.2d at 270); and (2) whether the conduct in question fell below that standard of care, which the dissent properly notes is almost always the province of the jury.

**Dickson, J., dissenting:**

The majority opinion concludes that Catholic Charities, by showing that it complied with Indiana Code section 31-19-5-15(b)(1), which requires adoption agencies to check the putative father registry at least one day after the close of the putative father's deadline, met its initial burden of making a prima facie case for summary judgment. I respectfully disagree.

Under Indiana tort law, when applying the "duty-breach-damages" analysis to determine the tort of negligence, "the duty of care is well established—that care which is reasonable under the circumstances." Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265, 270 (Ind. 2003). Except when a specific duty is declared by statute or common law, it is the duty of reasonable care under the circumstances that governs. The parties do not dispute that Catholic Charities owed to the Kramers the duty of reasonable care. Thus, the issue in this case is not whether there was a special duty to take or refrain from specific action, for example, a duty to conduct a pre-placement check, a duty to disclose the failure to conduct checks, or a duty to inform of risks. The essence of the parties' disagreement here is whether the action and/or lack of action of Catholic Charities satisfied the single overriding duty of reasonable care under the circumstances, or in other words, whether the duty was breached. Because it involves an evaluation of reasonableness under the circumstances, breach of duty is rarely appropriate for summary judgment. I believe this case to be no exception.

I believe that, as the party moving for summary judgment, Catholic Charities did not affirmatively demonstrate that its exercise of reasonable care for the Kramers under the circumstances is established by undisputed facts. For this reason, the motion for summary judgment filed by Catholic Charities should be denied, and the Kramers' negligence claim should be permitted to proceed to trial.