

ATTORNEY FOR APPELLANT

Tony H. Abbott
Foley & Abbott, LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
GURDWARA HAR GOBIND
SAHIB JI CORPORATION

Elizabeth S. Schmitt
Wooden McLaughlin LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Harjinder Singh, | September 8, 2020 |
| *Appellant-Plaintiff*, | Court of Appeals Case No. 20A-CT-959 |
| v. | Appeal from the Johnson Superior Court |
| Amardeep Singh and Gurdwara Har Gobind Sahib Ji Corporation, | The Honorable Kevin M. Barton, Judge |
| *Appellees-Defendants*. | Trial Court Cause No. 41D01-1806-CT-94 |

**Brown, Judge.**

[1] Harjinder Singh appeals the trial court's entry of summary judgment in favor of Gurdwara Hargobind Sahib Ji Corporation ("Gurdwara Hargobind").[1] We reverse and remand for further proceedings.

## *Facts and Procedural History*

[2] On April 15, 2018, Harjinder visited the gurdwara, or the Sikh place of worship,[2] in Greenwood to attend Baisakhi, a special day of celebration.[3] At some point after prayer, a "group that was trying to take over control of the Gurdwara came into the temple and started a fight,"[4] and a dispute arose that became physical. Harjinder was stabbed in the back and assaulted in other areas of his person. Appellant's Appendix Volume III at 107.

On June 25, 2018, Harjinder filed a complaint against his alleged assailant, Amardeep Singh, a member of the Gurdwara Hargobind board, and he later amended his complaint to include Gurdwara Hargobind as a defendant. The amended complaint alleged that, as an operator of the gurdwara, Gurdwara

---

[1] While the caption page of appellee's brief refers to the entity as "Gurdwara Har Gobind Sahib Ji," Appellee's Brief at 1 (capitalization omitted), in its answers to Harjinder's first set of interrogatories, Gurdwara Hargobind indicates that the correct legal name is "Gurdwara Shri Guru Hargobind Sahib Ji Corporation." Appellant's Appendix Volume II at 80.

[2] In his deposition, Rubaldeep Pawra indicated that Sikhs "usually prefer 'gurdwara' but people do use 'temple' also." Appellant's Appendix Volume III at 23.

[3] In his deposition, Pawra referred to the day of the incident and special day of celebration for the Sikh religion as "Vaisakhi." Appellant's Appendix Volume III at 28.

[4] These comments appear in the Gurdwara Hargobind's answers to the first set of interrogatories, which Harjinder designated, *see* Appellant's Appendix Volume III at 5, and we construe all factual inferences in favor of the nonmovant, Harjinder. *See Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013).

Hargobind owed business invitees a duty to maintain its premises in a reasonably safe condition which it breached by "failing to reasonably control its congregation and failing to provide proper security." Appellant's Appendix Volume II at 38 (emphasis in original).

[3] On October 31, 2019, Gurdwara Hargobind filed a motion for summary judgment and, in an accompanying brief, argued it did not owe a duty to protect Harjinder from the unforeseeable criminal acts of third parties. It designated an October 29, 2019 affidavit of a then-current Gurdwara Hargobind board member, Rubaldeep Pawra, which stated: prior to April 15, 2018, and in response to the 2012 Sikh temple shooting in Wisconsin, Gurdwara Hargobind hired off-duty Greenwood Police Department Officers to be present on-site during Sunday services and that, from time to time, Gurdwara Hargobind would also hire a private security company to provide security for larger events, with no written contract, by calling in advance if required. It indicated: prior to elections in April 2018, Gurdwara Hargobind was aware of rising tensions between two different groups so it notified the Greenwood Police Department that it was concerned that certain agitators in the community would cause trouble at the temple; the Greenwood Police Department suggested that Gurdwara Hargobind send letters to the potential agitators, instructing them not to enter the Temple, and that any unauthorized entry would be an unlawful trespass; and the letters were sent prior to April 15, 2018, and were provided to the Greenwood Police Department so that it was aware of the letters and the identities of individuals who were not supposed to be on the property. Pawra's

affidavit further stated Gurdwara Hargobind made the decision not to announce the new committee that would be taking control on April 15, 2018, in an effort to avoid any confrontation, had no knowledge that any acts of violence were about to occur in part because of the preventative measures taken, and similarly had no reason to believe the perpetrator who allegedly stabbed Harjinder would pose any threat of violence on the day of the incident. It further indicated that off-duty Greenwood Police Department officers, a Marion County Sheriff, and Central Patrol Security were all on-site that day to provide security services[5] and that, without the knowledge and consent of Gurdwara Hargobind, the Chief of Police instructed members of the Greenwood Police Department to stand down and allow trespassers onto the property. Gurdwara Hargobind designated its answers to Harjinder's first set of interrogatories, which were completed by Pawra and indicated that Central Patrol Security had been "hired on April 7, 8, 15, and 22, 2018, as well as various other dates when large events were held" to "ensure the safety of the Gurdwara's members," that "[m]embers of the committee" were in charge of hiring the security company, and that the "number of security guards present would depend on the occasion." *Id.* at 81. As to what was done to avoid the incident, Gurdwara Hargobind answered in part that it hired security and it had "trespassed individuals" who were "known to be trying to take over control of the Gurdwara." *Id.* Additionally, Gurdwara Hargobind designated Harjinder's

---

[5] In its answers to the first set of interrogatories, Gurdwara Hargobind indicated that it had hired the officers, sheriff, and patrol security.

answers to its first set of interrogatories, in which he answered, in response to being asked to describe his observation of the events which precipitated the assault, that the "[d]efendant, suddenly and without provocation, violently stabbed" him in the shoulder with a spear. *Id.* at 102.

[4] On February 20, 2020, Harjinder filed a brief in response to the motion for summary judgment in which he argued that Gurdwara Hargobind had actual knowledge of potential danger and actively participated in events which precipitated his injury. Appellant's Appendix Volume III at 10. Specifically, Harjinder contended Gurdwara Hargobind's leadership were "active participants in starting and continuing the brawl," Gurdwara Hargobind's Committee "was planning for trouble at the Temple" on April 15, 2018, and that Gurdwara Hargobind knew: tensions were high, some people were "angry about the way in which the new Committee had been hand-picked by the old Committee," police had been called the previous weekend to quell a disturbance, the old and new Committees had issued Termination Notices to twelve members who may have received them from a Sheriff's deputy as they were entering the gurdwara that day with their families, they had arranged for more security to be present, and some of their members were carrying weapons. *Id.* at 5, 10-11. He also argued that it assumed a duty to everyone who came to worship through the affirmative act of hiring guards.

[5] Harjinder designated a February 12, 2020 deposition of Pawra and attached Gurdwara Hargobind's "Constitution (By-Laws)," which was dated February 2010, stamped "Indiana Secretary of State Packet . . . Effective Date:

03/19/2010," and which contained articles titled "Membership,"[6] "Board of Directors,"[7] and "Executive Committee (of the Board of Directors)."[8] *Id.* at 65, 69, 70-71. In the deposition, Pawra explained that every two years an application for board members was released and that he did not know of any other qualifications for board membership; that board membership changed every two years and one could not serve on consecutive boards; and that eleven individuals selected from the new board of directors serve on the executive committee. Pawra stated he was first selected as a board member in March or April of 2018, was serving at the time of the deposition as an executive committee member, and participated in the selection which nominated him to the executive committee. He indicated the selection of the committee occurred by "[m]utual understanding"[9] in a school building beside the gurdwara, the meeting had been relocated because "people who don't normally attend the gurdwara" were shouting in the main building, everyone "was asked to go there," and some board members chose not to go to the meeting. *Id.* at 26-27.

---

[6] This article includes a section titled "2.10 Termination of membership from the Corporation." Appellant's Appendix Volume III at 69.

[7] Under this article, section "4.03 Method of Selection" indicates that the "selection date" was the last Saturday of March and that the new Board of Directors would take charge on Baisakhi Sunday. Appellant's Appendix Volume III at 70.

[8] Under this article, section 5.01 indicates that the executive committee would be selected from the new Board of Directors on the same day of board selection.

[9] Titled "Method of Selection," section 5.03 of the Executive Committee article states that "1) Representatives to the Committee posts shall be selected with mutual understanding. If mutual understanding is not reached, proceed to step 2," which indicates an alternative process involving individual names written on slips and selection by a minor. Appellant's Appendix Volume III at 71.

When asked when that event occurred, Pawra answered that it "was Saturday prior to the incident," and when asked if there were law enforcement or security personnel on-site that Saturday, he indicated that law enforcement were called and that "around eight officers came in." *Id.* at 27. He indicated that, upon their arrival, law enforcement asked people to leave and evacuate the building; everybody was asked to leave, which "[t]ook awhile"; the board had not selected the executive committee by then; and at that point the board moved to another building. *Id.* When asked if he or "the gurdwara t[ook] steps" after the election date and before the date of the incident "to avoid further disturbance," Pawra answered in the affirmative and stated, "we hired extra security" and "tr[ied] not to announce the committee so there was no shouting or anyone making any moves." *Id.* at 28. He later indicated that during the incident the security guards called the police and that he was told fifty-six police officers were dispatched.

[6] Harjinder also designated a letter dated April 12, 2018, from an attorney writing on behalf of Gurdwara Hargobind's board of directors and executive committee titled "Notice of Membership Termination, Exclusion and Denial of Entry . . . ." *Id.* at 87 (capitalization omitted). The letter indicates that the board and committee convened on April 11, 2018, and voted to terminate the letter recipient's membership in Gurdwara Hargobind and to bar any participation in the temple's activities. The resolution/minutes terminating membership was attached as an exhibit to the letter, and it listed the names of twelve individuals who were no longer permitted on the premises. According to Pawra's

deposition, Satnam Singh ("Satnam") was one of the members of the previous committee responsible for the letter, and the Marion County Sheriff was hired and present at the gurdwara to hand the letter to any individual who had not received it by mail.

[7] Harjinder additionally designated four video files labeled "Amardeep Hands Off Spear," "Escort Out," "Swinging the Spear," and "Vestibule Skirmish," which he stated were recorded on April 15, 2018, using cameras inside the gurdwara. Exhibit A-7. *See* Appellant's Appendix Volume III at 17. He stated the videos showed the "fighting started with the Gurdwara's president, Satnam Singh, pushing Davinder Nijjar, but it spread to engulf others." Appellant's Appendix Volume III at 7. In his affidavit, Nijjar stated:

> On April 15, 2018, before the fighting broke out, I was watching several of the old committee members, including Satnam Singh and Jasdeep Pawra, count the money that the Gurdwara had received from members that morning. Members of the old committee finished counting, and wrote the totals down on a piece of paper. I was concerned that the members of the old committee were mishandling the money, so I asked to take a picture of the paper that logged the money. Several of the old committee members, including Satnam Singh and Jasdeep Pawra, became angry at my question and threatened me. I attempted to walk away from the group, but they followed me. I believed that Satnam Singh, who was the president of the old committee, shoved me first. Then others then began to shove me.

*Id.* at 124. In a designated affidavit, Daljit Singh stated that, "before the fighting broke out, I witnessed people carrying weapons inside of" the

gurdwara; that, "[a]lthough carrying weapons is a religious practice, it was not normally done inside the place of worship," and that he felt threatened by the people wielding weapons inside the prayer hall. *Id.* at 120. According to Pawra's deposition, signs were posted in the gurdwara that no photos or videos were allowed to be taken because of "[b]ad publicity, where people do get into argument and make the videos and post them online telling this gurdwara is doing this, that people are getting argue [sic]." *Id.* at 45.

[8]     On April 1, 2020, the court granted Gurdwara Hargobind's motion for summary judgment in a seventeen-page order which discussed foreseeability as an element of duty in the context of the Indiana Supreme Court's decision in *Goodwin v. Yeakle's Sports Bar*, 62 N.E.3d 384 (Ind. 2016), and several subsequent decisions of this Court, before finding:

> 27.  . . . [T]he Gurdwara asserts that "it is not foreseeable that a sudden stabbing that Plaintiff described as 'violent' and 'without provocation' . . . would occur in a house of worship". . . .
>
> 28.  Plaintiff presents a more fact specific inquiry of foreseeability. . . .  ["]In short, they[, the Committee,] knew that they were sitting on a potential powder keg and that the least spark might set it off.  What happened was reasonably foreseeable in light of the information known to the Gu[]rdwara's Committee." . . .
>
> 29.  The Supreme Court in *Goodwin* focused the inquiry on "the broad type of plaintiff and harm involved".  *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 393 (Ind. 2016). . . .
>
> 30.  The broad type of Plaintiff here is a worshiper at a place of worship.  The broad type of harm is the probability or likelihood

that an act of violence will be committed. Places of worship are historically places of peace. This is no different in Sikhism whose members follow the Five Virtues of truth, compassion, contentment, humility and love.

31. In fairly applying the "broad type of plaintiff and harm involved" as set forth in *Goodwin*, it would not be foreseeable that a worshiper at a place of worship[] would have committed against the worshiper an act of violence by a fellow worshiper. Accordingly, a duty would not arise to provide security to protect the worshiper.

32. However, the Court has to take into account that a more fact specific standard has been applied by the Court of Appeals and recognized by the [Indiana] Supreme Court in *Cavanaugh*[*'s Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837 (Ind. 2020)].

The Court looks at the factors cited by the Plaintiff.

> A. "They (the Committee) knew that tensions were high," . . . . Plaintiff's statement is accurate.

> B. "that some people were angry about the way in which the new Committee had been hand-picked by the old Committee," . . . . There is no evidence that the "new committee" was "handpicked" by the "old committee".

> C. "that police had been called to the Gurdwara the previous weekend to quell a disturbance,"

> Police were called the Saturday preceding April 15.

> The "disturbance" consisted of people "shouting".

> D. "that the old and new Committees had issued Termination Notices to members who may have received them from a Sheriff's deputy as they were entering the Gurdwara that day with their families," . . . . A written Notice of termination of membership was prepared by [an]

attorney . . . to the [a]ffected members. The Notice was sent out to the effected members. . . . The statement is accurate as set forth, although it does not include the relevant information that notices of termination had been mailed prior to April 15, 2018.

E. "that they had arranged for more security to be present. . . . That statement is correct.

F. "and that some of their members were carrying weapons."

Weapons are present. Weapons in the Sikh religion represent homage to the warrior ancestors who defied the Mughal Empire.

33. Plaintiff classifies the broad type of Plaintiff as "any person present at the Gu[r]dwara when Committee members and its president, Satnam Singh, pushed and shoved Davinder Nij[j]ar in a tense and polarized environment."

* * * * *

35. Plaintiff's "broad type of harm includes the injuries resulting from the brawl that was ignited by the those (sic) actions."

36. In delving further into the specific facts, tension was present. Certain individuals believed that those individuals should be represented on the Committee in charge of the Gurdwara. From this knowledge, Plaintiff asserts that foreseeability would create a duty upon the Gurdwara to provide security during a religious ceremony.

37. The Court is unable to correlate that knowledge of tensions arising from a dispute over the leadership of the Gurdwara makes it foreseeable that violence will result. . . . Here, there is no evidence of prior violence. There is no[] evidence that the Gurdwara had knowledge that Amardeep Singh had been responsible for acts of Violence. The disturbance to which

Plaintiff refers consisted of shouting. Of all occasions, religious ceremonies would be most antithetical to violence. The Court does not find a basis from event [sic] leading up to the physical altercation that the Gurdwara would have had contemporaneous evidence of imminent harm as set out in *Cavanaugh's* . . . .

38. Plaintiff posits the creation of the duty in the interaction between Nijjar and [the Committee president]. Effectively, Plaintiff removes the element of foreseeability and turns the determination of duty into a pure policy determination.

39. Even assuming that foreseeability was established, what are the parameters of the duty imposed upon the Gurdwara? Two, and later three, private security guards were present after the two off duty police officers were directed to stand down. . . . Ultimately fifty-six police officers responded to the Gurdwara on April 15, 2018. Plaintiff is asserting that knowledge of tension creates a duty to have an indeterminate number of security officers of up to fifty-six present during a religious observance. Even casting foreseeability aside and making an analysis from a pure social policy standpoint (the third element of *Webb*[ *v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), *reh'g denied*]) the Court is unable to conclude that duty would be so expansive.

40. . . . [T]he Court is unable to conclude that violence was foreseeability [sic] so as to create a duty.

41. Plaintiff then asserts that Defendant Gurdwara "assumed a duty to everyone who came to the Gurdwara to worship, including the Plaintiff, through the affirmative act of hiring security guards."

* * * * *

43. Defendant Gurdwara had not hired security to protect worshipers from fellow worshipers. . . .

44[.] Security was on[-]site to protect against external threats.

Appellant's Appendix Volume II at 26-32 (some internal citations omitted). Finding no genuine issue of material fact, the court entered summary judgment in favor of Gurdwara Hargobind and against Harjinder.

### *Discussion*

[9] The issue is whether the trial court erred in entering summary judgment in favor of Gurdwara Hargobind. We review an order for summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* We construe all factual inferences in favor of the nonmoving party and resolve all doubts as to the existence of a material issue against the moving party. *Id.* Summary judgment is rarely appropriate in negligence cases because they are particularly fact-sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence. *Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 19 (Ind. Ct. App 2015) (citing *Kramer v. Catholic Charities of Diocese of Fort Wayne-S. Bend, Inc.*, 32 N.E.3d 227, 231 (Ind. 2015)).

[10] Harjinder argues that Gurdwara Hargobind had a duty, which arose from the foreseeability of his injury, to take reasonable precautions to protect him from

injury at the hands of others at the temple. He asserts reasonable inferences support the conclusion that Gurdwara Hargobind had reason to know a violent reaction to the shoving incident would spark a widespread altercation likely resulting in injury, and that the knowledge and actions of the president of the Executive Committee are imputed to Gurdwara Hargobind. He further argues that Gurdwara Hargobind assumed a duty to everyone who attended to worship through the affirmative act of arranging for extra security to be on-site and that the court's related findings are contrary to the evidence.

[11] Gurdwara Hargobind maintains it had no warning that a physical attack was imminent at the time of the incident, that the occurrence of a verbal altercation the weekend before was immaterial, and that Harjinder's proposed interpretation of the duty would make premises owners the insurers of their invitees. It further argues that, even if this Court were to determine there was a duty owed or assumed, it did not breach the duty as it took all reasonable measures on April 15, 2018, to provide a safe environment for its worshippers.

[12] In maintaining that the trial court correctly determined it did not owe or assume any duty to protect Harjinder from an unforeseeable physical altercation at the temple on April 15, 2018, Gurdwara Hargobind points to *Cavanaugh's*, 140 N.E.3d 837 (Ind. 2020), the Indiana Supreme Court's latest jurisprudence on the issue. In concluding that the duty of a landowner to protect the plaintiff did not extend to an unforeseeable criminal attack, the Court stated:

Landowners must "take reasonable precautions to protect invitees from foreseeable criminal attacks." *Rogers v. Martin*, 63 N.E.3d 316, 326 (Ind. 2016) (citation omitted). Ascertaining whether this duty extends to "the criminal act at issue," *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 389 (Ind. 2016), in a "particular scenario," *Rogers*, 63 N.E.3d at 320, hinges on the foreseeability of the attack, requiring "a general threshold determination that involves an evaluation of (1) the broad type of plaintiff and (2) the broad type of harm," *id.* at 325. When considering these categories, courts should determine whether the defendant knew or had reason to know of any present and specific circumstance that would cause a reasonable person to recognize the probability or likelihood of imminent harm.

Under the criminal act at issue in this particular scenario, Cavanaugh's owed no duty to protect its patron from the sudden parking lot brawl when no evidence shows that Cavanaugh's knew the fight was impending. Because we continue to decline to impose a comprehensive "duty on proprietors to afford protection to their patrons" from unpredictable criminal attacks, *Goodwin*, 62 N.E.3d at 394, we reverse and remand.

\* \* \* \* \*

[T]he parties contest the specifics of the parking-lot encounter. But, as discussed below, that disagreement does not affect the threshold legal question of whether Cavanaugh's owed Porterfield any duty.

\* \* \* \* \*

[F]oreseeability in this context – as a component of duty – is evaluated differently than foreseeability in proximate cause determinations: while the latter foreseeability analysis requires a factfinder to evaluate the specific facts from the case, the former "involves a lesser inquiry," requiring a court, as a threshold legal matter, to evaluate "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence."

*Goodwin*, 62 N.E.3d at 393 (citation omitted); *see generally id.* at 392 (rejecting a prior-used totality test because it "focuses on the particular facts of the case rather than a broader inquiry" and "is ill-suited to determine foreseeability in the context of duty"). By focusing "on the general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected," *Rogers*, 63 N.E.3d at 325, courts must "assess whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it," not merely that harm is "sufficiently likely," *Goodwin*, 62 N.E.3d at 392 (quotation omitted). "[B]ecause almost any outcome is possible and can be foreseen," *id.*, this ensures "that landowners do not become the insurers of their invitees' safety," *Rogers*, 63 N.E.3d at 324 (quotation omitted).

Just over three years ago, this Court adopted and applied these principles in companion cases handed down on the same day. First, because bar owners don't "routinely contemplate that one bar patron might suddenly shoot another," we held that a bar owed no duty to a patron who was unexpectedly shot by another. *Goodwin*, 62 N.E.3d at 394. Expressly rejecting the injured patron's request to consider prior police reports and evidence of the character of the neighborhood, this Court emphasized that foreseeability in the duty context is not to be "premised on the facts of [a] particular case." *Id.* at 392, 393. This historical evidence – while appropriate to consider when assessing foreseeability at the proximate-cause stage – was inappropriate to contemplate in the "lesser inquiry" concerning duty. *Id.* at 393. Ultimately, no present knowledge informed the landowner that any sudden harm was impending, and the restaurant didn't owe the patron a duty to protect him from the "criminal act at issue." *Id.* at 394, 389.

And second, a homeowner owed no duty to protect a party guest suddenly attacked by a co-host because hosts don't "routinely physically fight guests whom they have invited." *Rogers*, 63

N.E.3d at 326. "Although house parties can often set the stage for raucous behavior[,] . . . to require a homeowner to take precautions to avoid this unpredictable situation would essentially make the homeowner an insurer for all social guests' safety." *Id.* No duty to protect from the unexpected fight was owed to the house-party guest.

140 N.E.3d at 838-840.

Further, the Court addressed evaluating the "broad class of plaintiff" and the "broad type of harm" in these cases and acknowledged that, when it did so in these cases,

> a key factor is whether the landowners knew or had reason to know about any *present and specific circumstances* that would cause a reasonable person to recognize the probability or likelihood of *imminent harm*. *See Goodwin*, 62 N.E.3d at 385 (noting that, just before the barroom shooting, all the parties were separately "socializing" at "the small establishment"); *Rogers*, 63 N.E.3d at 319 (remarking that the homeowner observed that her co-host was, before attacking a house-party guest, "just 'being normal,' and it was not obvious to her that he had 'a buzz going'" from drinking alcohol); *id.* (observing that, before the guest was found dead outside her home, the homeowner saw him "lying motionless on the basement floor with his eyes closed"). If landowners had reason to know of any imminent harm, that harm was, as a matter of law, foreseeable in the duty context. *See, e.g.*, *id.* at 327 (holding that it was foreseeable "that a house-party guest who is injured on the premises could suffer from an exacerbation of those injuries"). In the years since *Goodwin* and *Rogers*, courts have thoughtfully applied this framework, finding duty *only when landowners had this contemporaneous knowledge*.

* * * * *

[W]hen a college student sexually assaulted his inebriated sophomore party guest in his fraternity house, the Southern District found a duty owed when the "fraternity knew or should have known of [ ] prior allegations" of sexual assault against the member. *Doe v. Delta Tau Delta Beta Alpha Chapter*, No. 1:16-cv-1480, 2018 WL 3375016, at *4 (S.D. Ind. July 11, 2018). A year-and-a-half before this assault, another sophomore's friend told four of this member's fraternity brothers that he had sexually assaulted her during a similar alcohol-fueled event while she was "blacked out or possibly unconscious." *Id.* at *2. These fraternity brothers were bound, by their fraternity's code of conduct, to "confront members of this Fraternity who" violated the code, which compelled respecting "the dignity of all persons" and barred the "sexual[ ] abuse [of] any human being." *Id.* at *3. Because "a defendant's actual knowledge is an appropriate consideration in determining foreseeability and the existence of any duty owed," the fraternity's awareness, through its members, of the accusations of sexual assault against this particular member gave it a duty to protect the "invitee to a social fraternity event" from his assault at the party. Like the restaurants and bar discussed above [(i.e., the parties in *Hamilton v. Steak 'n Shake Operations Inc.*, 92 N.E.3d 1166 (Ind. Ct. App. 2018), *trans. denied*; *Certa v. Steak 'n Shake Operations Inc.*, 102 N.E.3d 336 (Ind. Ct. App. 2018), *trans. denied*; and *Buddy & Pals III, Inc.*, 118 N.E.3d 38)], the fraternity had reason to recognize the probability or likelihood of looming harm when it hosted another spirited gathering and left the very member it knew was accused of sexual assault unhindered to assault another drunken party guest.

But without notice of present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, our Court of Appeals has consistently held since *Goodwin* and *Rogers* – until now – that landowners cannot foresee these sudden attacks.

*Id.* at 840-843 (emphases added).

The Court's 3-2 majority opinion seems to instruct both narrowing the review of whether a duty is foreseeable and limiting when a duty is found to exist. In applying its framework, the Court ultimately found:

> Cavanaugh's had no reason to foresee a bar patron blinding another during a sudden parking lot fight. Unlike the cases where courts have found a duty when a landowner knew or should have known about likely looming harm, Porterfield does not show that Cavanaugh's had any reason to believe the fight would occur. The skirmish occurred suddenly and without warning: for hours before the fracas, Porterfield and his friend socialized with bartenders and had no animosity with any other customers. Indeed, no evidence suggests any tension in the bar before the fight. *Cf. Hamilton*[ *v. Steak 'n Shake Operations Inc.*, 92 N.E.3d 1166, 1173 (Ind. Ct. App. 2018)] (holding fight foreseeable when restaurant knew of "[a]n escalating thirty-minute encounter" between specific groups)[, *trans. denied*]; *Certa*[ *v. Steak 'n Shake Operations, Inc.*, 102 N.E.3d 336, 340-341 (Ind. Ct. App. 2018)] (holding fight foreseeable when restaurant knew "patrons had engaged in a verbal altercation and was aware of the potential for escalation of the conflict")[, *trans. denied*]. And the bar had no reason to think that Porterfield, his assailants, or any of their affiliates were particularly suited to committing the specific criminal acts they perpetrated. *Cf. Buddy & Pals*[ *III, Inc. v. Falaschetti*, 118 N.E.3d 38, 43 (Ind. Ct. App. 2019)] (holding fight foreseeable when bar knew patron "was not taking his ejection [for fighting] well and was in a fighting mood")[, *trans. denied*]; *Delta Tau Delta*[ *Beta Alpha Chapter*, No. 1:16-cv-1480-JMS-DML, 2018 WL 3375016, at *4 (S.D. Ind. July 11, 2018)] (holding sexual assault foreseeable when "fraternity knew or should have known of the prior allegations" of sexual assault against particular member).

> By pointing to police runs made to the bar during the year before the quarrel, Porterfield improperly substitutes evidence of the bar's past raucousness for contemporaneous knowledge of

imminent harm. We repeat, this type of historical evidence, while "appropriate in evaluating foreseeability in the context of proximate cause," should play no role when we evaluate "foreseeability as a component of duty." *Goodwin*, 62 N.E.3d at 393. Considering prior reports of the bar's unruliness shifts our common law jurisprudence back into a recently supplanted totality analysis and risks fabricating a duty when harm is merely "sufficiently likely." *Id.* at 392 (quotation omitted). A landowner's present knowledge, however, more conclusively elevates the knowledge of risk to "some probability or likelihood of harm," *id.*, allowing courts to continue to find a duty when "reasonable persons would recognize it and agree that it exists," *Rogers*, 63 N.E.3d at 325.

*Id.* at 843-844.

[15] In a separate opinion in which Justice David joined, Justice Goff dissented and disagreed with adding new requirements to the foreseeability inquiry that "elevat[ed] the standard to impose a duty." *Cavanaugh's*, 140 N.E.3d at 844 (Goff, J., dissenting). He further observed that the "majority also relie[d] on the particular facts of this case" including "the lack of tension in the bar, noting that 'for hours before the fracas, [the plaintiff] and his friend socialized with bartenders and had no animosity with any other customers.'" *Id.* at 846 (quoting majority op. at 843). Accordingly, it appears that, in practice, an examination of particular facts is necessary to fully resolve the question of duty

at this stage and to properly apply *Cavanaugh's* required "foreseeability as a component of duty" analysis.[10] *See* 140 N.E.3d at 844 (majority op.).

[16] Here, the designated evidence reveals that, on the weekend prior to the April 15th incident, shouting in the main building disrupted the selection of a new Executive Committee, that the selection process was relocated, that law enforcement was called, and that, when "around eight officers came in," everybody was asked to leave. Appellant's Appendix Volume III at 27. After the election, the Committee took steps to avoid further disturbances, including not announcing the committee selection, hiring extra security, and issuing membership termination letters for twelve members.

[17] On the day Harjinder asserts Amardeep, a Gurdwara Hargobind board member, stabbed him, more security guards were present on the premises than on the election Saturday. Signs were posted in the gurdwara that restricted photos or videos because of bad publicity and people becoming argumentative. That day, people carried weapons, which the designated evidence reveals was a normal practice, and carried weapons inside the place of worship, which Harjinder's designated evidence indicated "was not normally done." *Id.* at 120.

---

[10] For example, the examination of a landowner's "present knowledge" is an inquiry which the *Cavanaugh's* majority instructs may "more conclusively elevate[] the knowledge of risk to 'some probability or likelihood of harm'." 140 N.E.3d at 844 (majority op.). Despite the admonition in *Goodwin* that duty is to be determined "without regard to the facts of the actual occurrence," 62 N.E.3d at 393 (citation omitted), subsequent cases have utilized a review of "present and specific circumstances," *Cavanaugh's*, 140 N.E.3d at 840 (citing *Goodwin*, 62 N.E.3d at 385; *Rogers*, 63 N.E.3d at 319), in determining the existence of a legal duty. This appears to be a distinction without a difference, and clarification in this area would be helpful.

Further, members of the board and committee, including Satnam, the president of the Gurdwara Hargobind committee, terminated the memberships of twelve individuals by letter and, in anticipation that certain individuals had not received the notice, hired a Marion County Sheriff's deputy to hand out the letter the day of the incident and to prevent entrance to the premises. Two of the four designated video recordings, when viewed together, contain footage of Satnam and an entourage escorting Nijjar through the temple's prayer room, as well as of an individual wielding a spear. *See* Exhibit A-7, "Escort Out" clip at 0:21, "Swinging the Spear" clip at 0:01-0:08; Appellant's Appendix Volume III at 43. Satnam can be seen shoving Nijjar, who turns around and confronts him. Moments afterwards, individuals already inside the prayer hall surround Satnam, Nijjar, and the escort group, other individuals enter the room, a large crowd forms, and several physical skirmishes break out across the prayer hall. It is during this time that the stabbing in question occurs. We note that unlike in *Cavanaugh's*, which involved third parties, *i.e.*, a bar patron fighting with another departing bar patron in the parking lot, the present case involves Satnam, the president of the Gurdwara Hargobind committee, shoving Nijjar, which happened seconds before the larger fracas began when Harjinder was allegedly stabbed by a board member.

[18] On these facts, we find that Gurdwara Hargobind had notice of present and specific circumstances that would cause a reasonable person to recognize the risk of an imminent criminal act, and had reason to recognize the probability or likelihood of looming harm on a special day of celebration at which its change

in leadership was to be announced and the new Board of Directors was to take charge.

[19]    For these reasons, we reverse the trial court's entry of summary judgment in favor of Gurdwara Hargobind and remand for further proceedings.

[20]    Reversed and remanded.

Robb, J., and Crone, J., concur.